Linwood E. **BRILEY**

v.

Gary L. **BASS, Warden.**

Civ. A. No. 83–0289–R.

United States District Court,
E.D. Virginia,
Richmond Division.

April 19, 1984.

Deborah C. Wyatt, Charlottesville, Va., William H. Allen, William E. O'Brian, Jr., Timothy Hester, Washington, D.C., for plaintiff.

James E. Kulp, Jerry P. Slonaker, Richmond, Va., for defendant.

## OPINION

WARRINER, District Judge.

Before the Court is a petition for a writ of habeas corpus of Linwood E. Briley. The petition was amended on 16 September 1983, and respondent filed a motion to dismiss on 26 September 1983. Petitioner filed a rebuttal on 11 October 1983 and on 18 October 1983, respondent filed a supplemental reply.

On 29 November 1983, this Court entered an order directing the Commonwealth to provide petitioner with a transcript of the proceeding of 31 August 1983. On 30 December 1983, the Court directed the parties to submit briefs on the issue of whether petitioner's claim (3) was exhausted and to stipulate the evidence which was before the trial court at the time it denied the motion for a change of venue and present such evidence for this Court's consideration. On 4 January 1984, the Court ordered the parties to submit supplemental briefs on the possible application of *Carrier v. Hutto*, 724 F.2d 396 (4th Cir.1983), to this case. The parties complied in a timely manner

with the Court's orders of 30 December 1983 and 4 January 1984. On 23 January 1984, petitioner filed a supplemental memorandum in light of the transcript provided in the order of 29 November 1983. Respondent filed a reply on 3 February 1984. The motion to dismiss is now ripe for adjudication. The Court has jurisdiction under 28 U.S.C. § 2254.

Petitioner was convicted under Va.Code § 18.2–31(d) of capital murder for the willful, deliberate and premeditated killing of John Harvey Gallaher in the commission of robbery while armed with a deadly weapon. His punishment was fixed at death.

As the evidence adduced at trial showed, petitioner, his two brothers, and a friend, Duncan Meekins, decided to look for somebody to "mug" in the late evening of 14 September 1979. Carrying a sawed-off shotgun and a high-caliber rifle, the group parked near the Log Cabin, a southside Richmond restaurant and bar, and hid in the bushes behind the restaurant. They lay in wait for a chance at an easy victim, *i.e.*, a drunk.

The victim, Richmond disc jockey John Harvey Gallaher, shortly left the Log Cabin by a rear door and walked over toward the bushes where the waiting gunmen were hiding. Petitioner, brandishing the rifle, accosted Gallaher, ordered him to lie down on the ground, and took his wallet and keys. Petitioner instructed Meekins to find Gallaher's car in the parking lot and return with it. This done, petitioner and Meekins forced the victim to lie face down in the rear of the car and the three drove away. Anthony and James Briley returned to the car in which the group had arrived at the Log Cabin. They rejoined petitioner and Meekins some time later.

Meekins and petitioner drove the victim to Mayo Island in the James River and parked on the grounds of a paper company there. They forced Gallaher from the car and, as Gallaher began to stand up, petitioner shot him with the rifle. About 15 to 20 minutes had elapsed since the assailants first accosted the deceased.

After killing Gallaher, the group took his car, left the murder scene, and drove around the city in Gallaher's car until the gas tank was nearly empty. They then stripped the car of readily removable parts and abandoned it.

## I. *Exhaustion*

Absent a valid excuse, a prisoner must first exhaust his claims in State courts. 28 U.S.C. § 2254(b). The exhaustion requirement ensures that State courts have the first opportunity to review federal constitutional challenges to State convictions, thus preserving the role of State courts in protecting federally guaranteed rights. *Preiser v. Rodriguez*, 411 U.S. 475, 489–92, 93 S.Ct. 1827, 1836–37, 36 L.Ed.2d 439 (1973). Where exhausted and non-exhausted claims are presented in the same petition, the petition should be dismissed in its entirety to permit petitioner to exhaust the unexhausted claims and to present all claims together when they have been exhausted. *Rose v. Lundy*, 455 U.S. 509, 522, 102 S.Ct. 1198, 1205, 71 L.Ed.2d 379 (1982).

A claim has been exhausted when a habeas petitioner has " 'fairly presented' to the State courts the 'substance' of his federal habeas corpus claim." *Anderson v. Harless*, 459 U.S. 4, 16, 103 S.Ct. 276, 277, 74 L.Ed.2d 3, 7 (1982), quoting *Picard v. Connor*, 404 U.S. 270, 275, 277–78, 92 S.Ct. 509, 512, 513, 30 L.Ed.2d 438 (1971). A claim is not exhausted unless the specific federal constitutional argument was presented to the State courts. *Id.* 459 U.S. at 17–18, 103 S.Ct. at 277–78, 74 L.Ed.2d at 7–8.

In the typical case, the exhaustion requirement plays the important and effective role of reinforcing our federalist structure of government. Federal courts will not grant a writ of habeas corpus to one convicted by a State until the State, as an independent sovereign, has had the opportunity to consider the claim that the conviction is infected with fundamental error. State courts, as well as federal courts, have the responsibility of recognizing and en-

forcing the individual rights the Constitution confers upon criminal defendants.

The exhaustion doctrine works efficiently in the typical case where the punishment is incarceration. It is in the best interest of the prisoner, who believes his punishment to be invalidly inflicted, to first present all of his claims to the State courts. Unless he does, the ultimate disposition of his claim will be delayed, and the unjust punishment extended, when the federal court dismisses the action with instructions to return to the State courts to exhaust.

The capital murder case is different. When the punishment is death, delaying final disposition of collateral attacks upon the conviction delays enforcement of the sentence. Thus, it is in the best interest of the capital defendant to manipulate the legal processes available to him for as long as possible. In this context, the exhaustion doctrine is inefficient. It provides capital prisoners with yet another tool with which to delay and hinder the efficient resolution of collateral attacks upon their conviction. Indeed, for the past two to three decades we have witnessed an almost infinite number of collateral attacks in capital cases which have virtually judicially repealed the death sentence.

In this case, for instance, petitioner presented a claim of denial of material to which he was allegedly entitled under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), to the State courts. In this petition, he raises the *Brady* claim again, but adds to it new facts. Petitioner now argues that there exist transcripts of tape recordings and letters containing threats to the family of the star prosecution witness, Duncan Meekins, which should have been given to the defense under *Brady*. Petitioner alleges that he was previously unaware of this material.[1]

Under *Anderson v. Harless*, 459 U.S. 4, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982), and *Picard v. Connor*, 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971), that claim has not been exhausted. In *Picard* the Supreme Court noted that the "substance" of a claim must have been fairly presented to the State courts. *Id.* at 275–76, 92 S.Ct. at 512. In *Anderson*, all the facts relied on in the federal habeas had been presented to the State Court, but the legal argument made in federal court had not been made in the State habeas proceeding. The Supreme Court held that "[s]ince it appears that respondent is still free to present his ... claim to ... [the State courts] ... we conclude that he has not exhausted his available State-court remedies as required by 28 U.S.C. § 2254." *Id.* 459 U.S. at 18, 103 S.Ct. at 278, 74 L.Ed.2d at 8.

The instant petition presents the converse situation. He admits the *Brady* argument was made in State court, but he says the facts here presented were not there presented. By analogy to *Anderson*, petitioner might still present this new factual claim to the Virginia courts. This Court is faced with the possibility of having to dismiss this petition, thus playing into petitioner's hand by delaying the imposition of his punishment, or decide that the exhaustion requirement is unproductive in this context and refuse to apply it. Fortunately, the Court is spared this choice as the respondents have waived exhaustion of the claim. *See* Memorandum of Law filed 16 January 1984 at 7.

Respondent may waive exhaustion of a claim on behalf of the State. *Sweezy v. Garrison*, 694 F.2d 331 (4th Cir. 1982), *cert. denied*, —— U.S. ——, 103 S.Ct. 1882, 76 L.Ed.2d 812 (1983). To be effective, waiver must be unconditional. *Harding v. North Carolina*, 683 F.2d 850, 852 (4th Cir.1982).

In *Stamper v. Baskerville*, 724 F.2d 1106 (4th Cir.1984), this Court was reversed for accepting the waiver while the case was

---

1. This allegation is surprising in light of newspaper articles which the petitioner submitted to the trial court which discussed these threats. *See* "Meekins Says Briley Shot Boy," *Richmond Times-Dispatch*, January 25, 1980; "Jury Convicts Briley, Calls for Death Penalty," *Richmond Times-Dispatch*, January 26, 1980; "Meekins Says He Lied, Saw Briley Shoot Boy," *Richmond News-Leader*, January 25, 1980.

before this Court on remand from the Fourth Circuit. On appeal a second time the Fourth Circuit found this Court powerless to accept the waiver because in so doing it failed to comply with the mandate to dismiss to permit exhaustion. *Id.* at 1107. The Court of Appeals also noted that it was "troubled by the nature of the waiver asserted by the State." *Id.* at 1108. The Court feared that the State waived exhaustion only after it "was confident that it would prevail on all claims asserted by the defendant—that is, after the district court's first ruling on the habeas petition." *Id.*

Neither of the problems the Fourth Circuit perceived in this Court's acceptance of waiver in *Stamper* exists in this case. This Court does not presently have before it a mandate from the appellate court. Nor had the Court made any decision regarding the merits of this claim, much less indicated such to the parties, when the State waived exhaustion.

As the Court is confident that all other claims have been exhausted, and as the State has unconditionally waived exhaustion as to claim (3), the Court may now consider the petition.

## II. *Wainwright*

▉ Federal habeas corpus review of a State conviction may be barred by a petitioner's failure at trial or on direct appeal to provide State courts with an opportunity to consider and resolve the matter. Errors at trial not objected to, in contravention of State contemporaneous objection rules, are not cognizable in federal habeas corpus proceedings. *Wainwright v. Sykes,* 433 U.S. 72, 87–90, 97 S.Ct. 2497, 2506–08, 53 L.Ed.2d 594 (1977). Substantive review may also be barred by failure to pursue errors on appeal. *Cole v. Stevenson,* 620 F.2d 1055, 1060–61 (4th Cir.1980), *cert. denied,* 449 U.S. 1004, 101 S.Ct. 545, 66 L.Ed.2d 301 (1980). Virginia law states that, except for good cause shown or to enable the Supreme Court to do justice, any objection not contemporaneously made when error is committed may not be asserted on appeal. Rule 5:21, *Rules of Su-*

*preme Court. See Satterfield v. Zahradnick,* 572 F.2d 443, 446 (4th Cir.1978), *cert. denied,* 436 U.S. 920, 98 S.Ct. 2270, 56 L.Ed.2d 762 (1978). Thus, if petitioner in this case failed contemporaneously to object to errors as they arose in State courts, or to pursue objections which were made, relief under 28 U.S.C. § 2254 is barred in the absence of legitimate cause and definite prejudice. *Wainwright, supra.*

▉ In the motion to dismiss, respondent argues that a number of petitioner's claims should be barred by *Wainwright.* Petitioner argues in response that *Wainwright* does not apply to this case.

Petitioner asserts that *Wainwright* does not apply to capital cases because Federal courts recognize that the penalty of death is qualitatively different from any other penalty. Even if one recognizes that the United States Supreme Court considers death to be different, *see Lockett v. Ohio,* 438 U.S. 586, 605, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978), it is not true that *Wainwright* applies only in non-capital cases. Failure to utilize State procedures has barred substantive review of capital cases on federal habeas corpus in this and other federal courts. *Stamper v. Baskerville,* 531 F.Supp. 1122, 1128 (E.D.Va.1982), remanded on other grounds (4th Cir. October 4, 1982); *Gray v. Lucas,* 677 F.2d 1086, 1109 (5th Cir.1982), *cert. denied,* — U.S. —, 103 S.Ct. 1886, 76 L.Ed.2d 815, *reh. denied,* — U.S. —, 103 S.Ct. 3099, 77 L.Ed.2d 1357 (1983); *Ford v. Strickland,* 696 F.2d 804, 816–17 (11th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 201, 78 L.Ed.2d 176 (1983).

Application of *Wainwright* is consistent with the rationale of the Supreme Court as well. In *Wainwright,* the Court said:

The failure of the federal habeas courts generally to require compliance with a contemporaneous-objection rule tends to detract from the perception of the trial of a criminal case in State court as a decisive and portentous event. . . . Society's resources have been concentrated at that time and place in order to decide, within the limits of human fallibility, the ques-

tion of guilt or innocence of one of its citizens. Any procedural rule which encourages the result that those proceedings be as free of error as possible is thoroughly desirable, and the contemporaneous-objection rule surely falls within this classification.

*Id.* 433 U.S. at 90, 97 S.Ct. at 2508. Particularly in capital trials, it is important that the proceedings be, within the limits of reason, free of error. Without the contemporaneous-objection rule, defense counsel in capital trials will inevitably be tempted to "sandbag", or refrain from objecting, in the hope that punishment can be deferred. *See, Id.* at 89, 97 S.Ct. at 2507–08.

Petitioner also argues that *Wainwright* applies only in cases involving ineffective assistance of counsel. Not only has this Court applied *Wainwright* under circumstances similar to those of the case at bar, but so have other federal courts. *See Stamper, supra,* at 1128; *Gray v. Lucas, supra,* at 1109 (failure to request instruction); *Ford v. Strickland, supra,* at 816–17 (failure to appeal on issue of confession).

Petitioner argues that there is no procedural default rule in Virginia in cases involving ineffective assistance of counsel. In support of this contention, petitioner relies on *Crowell v. Zahradnick,* 571 F.2d 1257 (4th Cir.1977), *cert. denied,* 439 U.S. 956, 99 S.Ct. 357, 58 L.Ed.2d 348 (1978). In discussing Virginia's contemporaneous objection rule, the Court in *Crowell* said that State habeas relief might be available to petitioner if he could "show that the failure to make the objections to the admission of the inculpatory statements was the result of inadequate assistance of counsel." *Id.* at 1259, n. 2. Petitioner's reliance upon *Crowell* is misplaced. *Crowell* indicates only that a writ of habeas corpus might be available if, as an independent ground for relief, counsel's error was so grievous as to amount to ineffective assistance of counsel under the Sixth Amendment. *Id.*

■ Petitioner also argues that there is no contemporaneous objection rule in Virginia capital cases because Section 17–110.-1, Code of Virginia, requires that the Vir-

ginia Supreme Court review every case in which a sentence of death has been entered. Mandatory review in the Virginia Supreme Court is limited to certain issues, however. The Court is required to review only "1. Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and 2. Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." The contemporaneous objection rule applies to other issues, and, in fact, the Virginia Supreme Court has applied its contemporaneous objection rule in capital cases. *See Peterson v. Commonwealth,* 225 Va. 289, 302 S.E.2d 520, 525 (1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 202, 78 L.Ed.2d 176 (1983).

■ Petitioner argues that *Wainwright* should not bar review on the merits in this case because the State habeas court considered all of the claims on the merits. Where a State court considers the merits of a claim which might have been barred by procedural rules, *Wainwright* does not apply. *Ulster County Court v. Allen,* 442 U.S. 140, 154, 99 S.Ct. 2213, 2223, 60 L.Ed.2d 777 (1979); *Williams v. Zahradnick,* 632 F.2d 353, 359 (4th Cir.1980).

■ In this case, as in *Tweety v. Mitchell,* 682 F.2d 461, 464 (4th Cir.1982), *cert. denied,* 460 U.S. 1013, 103 S.Ct. 1255, 75 L.Ed.2d 483 (1983), the Virginia Supreme Court failed to state the basis for its decision. In denying Briley's petition for appeal, the Court stated only that it found "no reversible error" in the judgment of the lower court which denied his habeas petition. *Briley v. Mitchell,* No. 820509, (Va. 5 October 1982).

Nor is the decision of the lower court clear. In its final order, the court stated that the petition was dismissed "for the reasons that there was not any evidence that the attorneys for the petitioner were incompetent in their defense and that the trial judge was in any way prejudiced against the defendant, and that the attack

on both trial counsel and the trial court was frivolous and without merit; and for further reasons stated in the Court's Findings of Fact and Conclusions of Law set forth in the record." *Briley v. Mitchell,* No. F 81–1519, (Circuit Court of the City of Richmond, Division I, 18 December 1981).

In the record the Order of 15 December 1981 shows that the Court denied some of the claims because of "the failure of petitioner's counsel to raise this claim at trial or on appeal." The trial court deferred a decision on other claims which the Commonwealth claimed were procedurally barred until oral argument. In argument before the State trial court, the Commonwealth asked the trial court to clarify its rulings on the issues on which the trial court had deferred decision and to state that they were barred by *Slayton v. Parrigan,* 215 Va. 27, 205 S.E.2d 680 (1974), *cert. denied,* 419 U.S. 1108, 95 S.Ct. 780, 42 L.Ed.2d 804 (1975), which sets forth Virginia's procedural default rule. In response to this request, the trial court stated that the only claim not ruled upon was ineffective assistance of counsel, and that rulings on the other issues were "clear in my mind." Habeas Transcript at 7.

Given this exchange, this Court is of the opinion that the trial court denied the claims because they were procedurally barred, and the Virginia Supreme Court affirmed this ruling. In arriving at this opinion, the Court is counseled by the Fourth Circuit's opinion in *Tweety.* In *Tweety* the Court noted:

> [We] are not prepared to presume that the Court dismissed Tweety's petition on the merits simply because the court failed to state the grounds for its decision, [footnote omitted] and we agree with the district court that the Virginia Supreme Court probably dismissed Tweety's state habeas petition for failure to make a contemporaneous objection.

*Id.* at 464.

In this case, where the State court clearly applied the procedural default rule as to some claims and had before it argument as to the appropriate application of the rule to other claims, this Court is likewise not prepared to presume that the trial court considered the claims on the merits.[2] Similarly, I assume the Supreme Court of Virginia upheld the rulings on the same procedural ground.

 Finally, petitioner argues that *Wainwright* should not bar review of any of his claims because he will establish "cause" by showing that his trial counsel were ineffective in some instances. In *Engle v. Isaac,* 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982), the Supreme Court gave some definition to what constitutes "cause" and "prejudice". The Court discussed two matters which it found did not constitute cause under *Wainwright.* First, perceived futility in raising a timely objection will not alone constitute cause. *Id.* at 130, 102 S.Ct. at 1572. Second, failure to anticipate a change in the law will not constitute cause "[w]here the basis of a constitutional claim is available." *Id.* at 134, 102 S.Ct. at 1574. *Accord, Cole v. Stevenson, supra,* at 1060–61. The prejudice which must be shown is not the "possibility" of prejudice, but that trial error worked to *"actual* and substantial disadvantage, *infecting* his entire trial with error of constitutional dimensions." *United States v. Frady,* 456 U.S. 152, 170, 102 S.Ct. 1584, 1596, 71 L.Ed.2d 816 (1982). The burden is on the petitioner to demonstrate cause and prejudice. *Wainwright* 433 U.S. at 89–91, 97 S.Ct. at 2507–08.

 Petitioner may establish cause by showing attorney error which evinces ignorance or oversight. *Carrier v. Hutto,* 724 F.2d 396, (4th Cir.1983). A deliberate, strategic choice by counsel to refrain from objecting to a trial error or to forego preserving it on appeal does not constitute cause, unless the choice is so egregious as to amount to ineffective assistance of coun-

---

**2.** A simple statement to that effect by the State habeas trial judge would save a lot of searching and cogitating for the federal habeas trial judge.

sel. *Id.* The question is one of counsel's motivation, and the petitioner "has the burden of showing to the district court that the failure to object or to appeal his claim was the product of his attorney's ignorance or oversight, not a deliberate tactic." *Id.* at 401.

■ With this review of *Wainwright* as it affects this case, we turn to the specific claims asserted by petitioner. Petitioner alleges two instances in which the fairness of petitioner's trial was adversely affected by the trial court's management of the selection of the jury (Claims (4) and (5)). Petitioner alleges that the trial court struck for cause all veniremen who expressed opposition to the death penalty and limited questioning by defense counsel of those veniremen who did not express opposition to the death penalty. Respondent contends that both of these allegations are barred because petitioner did not raise these issues on appeal. *Wainwright v. Sykes, supra; Engle v. Isaac, supra; Cole v. Stevenson, supra.* The record supports respondent's contention.

To the extent that petitioner is alleging ineffectiveness of counsel as "cause" for these omissions, Second Response to Motion to Dismiss at 6, he fails to meet the standard set by *Carrier.* Petitioner's trial attorney testified at the State habeas proceedings that because he believed the jurors were struck properly and the *voir dire* was fair, he decided not to appeal on these grounds. Habeas at 270–272.[3] Counsel may, indeed must, make a professional judgment about what issues to raise on appeal. *Jones v. Barnes,* —— U.S. ——, ——, 103 S.Ct. 3308, 3313–14, 77 L.Ed.2d 987, 995 (1983). Counsel's performance in making these judgments was within the range of competence expected of criminal lawyers because the claims were without merit. *Marzullo v. Maryland,* 561 F.2d 540, 542–53 (4th Cir.), *cert. denied,* 435 U.S. 1011, 98 S.Ct. 1885, 56 L.Ed.2d 394 (1978).

■ Each venireman struck for opposition to the death penalty stated that he or she could not vote for the death penalty under any circumstances. *See* Transcript at 84, 98, 115–116, 131, 145–46, 149, 169, 212, 217–19; 222, 267, 283, 291, 325. Thus, the objection raised in Claim (4) was without merit under *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), *reh. denied,* 393 U.S. 898, 89 S.Ct. 67, 21 L.Ed.2d 186 (1969), and *Davis v. Georgia,* 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976).

■ Claim (5) is likewise without merit. Petitioner points to no authority, and the Court is unaware of any, which states that a defendant has the right to ask whether a potential juror would be merciful in sentencing. A juror's duty is to decide the case on the law and the evidence presented, and each venireman not stricken for cause demonstrated a willingness to do so. *See* Transcript at 49, 61, 105, 122, 134, 152, 157, 163, 176, 178–79, 205, 239–40, 242, 252, 257–58, 279–80, 290, 302, 323, 334. As petitioner has failed to show cause, the Court need not consider whether he suffered actual prejudice, *Engle v. Issac,* 456 U.S. at 134, n. 43, 102 S.Ct. at 1575, n. 43, and substantive review of these issues is barred.

■ Petitioner next charges that the jury was improperly instructed on the criterion of "aggravated battery" in the sentencing phase of the trial in light of the fact that there was insufficient evidence to support the giving of that instruction (Claim (10)) under *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), *reh. denied,* 456 U.S. 1001, 102 S.Ct. 2286, 73 L.Ed.2d 1296 (1982). Respondent cites *Wainwright* as a bar to this claim on the grounds that this allegation was not raised on appeal. The record supports this assertion. Petitioner asserts in a conclusory fashion that defense counsel's failure to object to submitting this criteria to the jury

---

**3.** "Habeas" refers throughout to the State Habeas Transcript; "Transcript" refers throughout to the Trial Transcript.

was not strategic and that it thus constituted ineffective assistance of counsel. Second Reply to Motion to Dismiss at 6. However, petitioner's trial counsel stated that he read *Godfrey* "the minute [it] ... came out" and determined that the issue, as to Briley, would not be helpful. Habeas at 254. The Court would note that *Godfrey* was cited by counsel for defendant for another proposition in the Petition for Rehearing. Counsel's judgment was within the range of competence expected of criminal lawyers as the claim is without merit. As is discussed further herein, *see* Section VII, there was evidence of mental and physical torture. The victim was subjected to the agony of anticipating his death for over a quarter of an hour and was assaulted by his killers during the course of the kidnapping, robbery, and murder. Transcript at 468–71, 478–79. *Marzullo, supra.*

Petitioner charges that the jury was improperly instructed that they did not have to be unanimous as to which criterion (either "aggravated battery" or "dangerousness"), if either, they found to justify imposition of death. Transcript at 830. (Claim 11)).[4] Respondent asserts that review of this allegation is barred by *Wainwright.* The record supports this allegation. Petitioner argues that counsel was negligent in not objecting at trial. The question of cause as defined by *Carrier* raises the question of the attorney's motivation in failing to object. As the parties have not cited and the Court has been unable to locate any reference to counsel's motivation on this point, the Court will assume that the failure to object to the instruction was the product of "ignorance or oversight," *Carrier v. Hutto,* 724 F.2d 396 at 403 (4th Cir.1983), and thus constitutes cause.

Before reaching the merits of petitioner's claim that the jury was improperly instructed that it did not have to unanimously find an aggravating circumstance, however, petitioner must show that prejudice resulted which infected the "entire trial with error of constitutional dimensions." *United States v. Frady,* 456 U.S. 152, 170, 102 S.Ct. 1584, 1596, 71 L.Ed.2d 816 (1982).

However, the Virginia Supreme Court has held that in imposing the death penalty following a capital murder conviction, the jury's verdict is not required to be unanimous as to the aggravating factors relied upon. *Clark v. Commonwealth,* 220 Va. 201, 257 S.E.2d 784 (1979), *cert. denied,* 444 U.S. 1049, 100 S.Ct. 741, 62 L.Ed.2d 736 (1980). Nor does the United States Constitution require that the jury be unanimous. The Supreme Court has only held that the capital sentencing proceeding is to meet some of the requirements of a criminal trial, such as the right to counsel. *Bullington v. Missouri,* 451 U.S. 430, 446, 101 S.Ct. 1852, 1862, 68 L.Ed.2d 270 (1981). It has not held jury unanimity on the sub-determination of aggravation is a constitutional requirement. Further, the Court notes that the jury unanimously found both aggravating circumstances. Transcript at 859. As petitioner has failed to show prejudice, further review of this claim is barred.

Petitioner alleges that trial defense counsel were prohibited from talking to Duncan Meekins (Claim 2(a)), the key prosecution witness, and from obtaining Meekins' juvenile record before trial (Claim (2)(b)) in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). Respondent

---

**4.** The parties disagree as to whether the instruction given by the Court implied that they did not have to be unanimous. The instruction given was:

"You have convicted the defendant of an offense which may be punished by death. You must decide whether the defendant shall be sentenced to death or to life imprisonment. Before the penalty can be fixed at death, the Commonwealth must prove beyond a reason-

able doubt at least one of the following two alternatives.—" Now, let me state to you, of these two alternatives, part of you may believe one, part of you may believe another, but at least all twelve of you must believe one or the other.

The Court believes this instruction, fairly interpreted, requires unanimity, but assumes for the sake of argument that the jury was instructed that they did not have to be unanimous.

asserts that petitioner failed to raise these issues on appeal before the Virginia Supreme Court, and is thus precluded from obtaining review of them in federal Court under *Wainwright.* The record reflects that petitioner did not raise these issues on appeal.

Petitioner urges that this failure establishes cause and that it is indicative of the ineffectiveness of counsel. Respondent argues that the issues were insignificant, and therefore not pursued on appeal, because Meekins' credibility was adequately attacked regarding his receipt of a plea agreement and his inconsistent statements. Transcript at 530–31, 535–36. Given the sufficiency of the attack on Meekins' credibility at trial, and the admonition of the Supreme Court that counsel need not raise every "colorable" claim on appeal, *Jones v. Barnes,* —— U.S. ——, ——, 103 S.Ct. 3308, 3314, 77 L.Ed.2d 987, 995 (1983), the Court is confident that counsels' failure to appeal on these issues does not constitute ineffective assistance of counsel.

Whether the failure to appeal constitutes "cause" under *Wainwright* is yet another issue. As no reference is made to counsels' strategic motivation, or the lack thereof, in the transcript of the State habeas proceeding, the Court will assume without deciding that cause has been shown, and move on to the issue of prejudice under *Wainwright.*

 As to Claim (2)(a), that counsel were denied an interview with Meekins, the Court notes that the trial court granted counsel an interview with Meekins so long as Meekins, through his attorney, consented. Motions Transcript at 63. The interview did not take place because consent was not forthcoming. Habeas at 144, 288–89. A witness may refuse to be interviewed. *United States v. Walton,* 602 F.2d 1176, 1179–80 (4th Cir.1979). The Commonwealth could not force Meekins to talk with defense counsel. Thus, no prejudice exists.

 As to Claim (2)(b), the denial of access to Meekins' juvenile record, the Court first acknowledges as true petitioner's contention that he has not yet been provided with a copy of Meekins' record, and has thus been unable to demonstrate prejudice. *See* Memorandum for Petitioner In Reply to Respondents' Reply Brief in Response to the Court's Order of 4 January 1984 at 3. However, the Court has examined Meekins' juvenile record, which was furnished *in camera* by the respondent, and finds it, relative to this case, to be brief and insignificant.

*Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), did not establish an absolute rule that defendants upon request be given the juvenile records of witnesses for the purpose of cross-examination. In *Davis,* the defendant did not attempt generally to discredit the witness by showing him to be a delinquent. *Id.* at 311, 94 S.Ct. at 1108. Rather the defendant had a specific objective in mind. He desired to establish on cross the bias of the witness by showing that he was on probation as a juvenile at the time of testifying, and therefore was in a position receptive to police coercion. *Id.* The Court found that, under those facts, the right of confrontation was "paramount to the State's policy of protecting a juvenile offender." *Id.* at 319, 94 S.Ct. at 1112.

In this case the defendant made a general request for the juvenile record of Duncan Meekins. The trial court examined the record and *Davis* to see if the defendant's rights would be impaired. *See* Motions Transcript at 62–63. The record discloses that though Meekins had a sentence pending for a juvenile offense at the time of the Briley trial, the coercive effect, if any, of the pending sentence, or its ability to be used as a lever, were naught in view of Meekins' involvement in the multiple murders. One who is faced with the death sentence cannot be concerned about possible punishment for a juvenile offense. Indeed, the matter was so insignificant, relatively, that it was not even a part of Meekins' plea bargain. The judge correctly decided that the record should not be disclosed. Even from the perspective of an exhaustive habeas corpus review, I con-

clude that no incremental increase in the doubt of Meekins' veracity would have accrued upon the disclosure and cross-examination of Meekins' juvenile record, and that no prejudice exists as to this claim.

### III. *Jurors*

■ Petitioner alleges that the trial court failed to strike for cause Barbara Smith and William Slaughter, jurors who had formed opinions about the case (Claim (6)). The record shows that the substance of the opinion Ms. Smith testified to having formed was "I would just like to see justice done, that's all."[5] Transcript at 53. She specifically denied that she had formed an opinion about petitioner's guilt and testified that she would be able to lay aside any preconceived notion she might have and decide the case on the evidence. Transcript at 50, 53.

In answer to what opinion he might have formed, Mr. Slaughter said:

Well, I have been in the middle. I have this broad spectrum and in the middle it's sort of neutral. To me neutral means—a neutral opinion, by definition, there is an opinion, yes, and there is an opinion, no. And in between, there is a wide band of neutrality. And it all depends—I mean, when you are in the middle, you are in the middle.

Transcript at 66. Mr. Slaughter also testified that he would be able to lay aside any preconceived opinion that he may have had, and decide the case on the evidence presented. Transcript at 62–63. In *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), the Supreme Court said that if a juror held a preconceived notion as to the guilt or innocence of the accused, due process would nevertheless be satisfied "if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in Court." *Id.* at 723, 81 S.Ct. at 1643. Neither Ms. Smith or Mr. Slaughter testified to having any preconceived notion as to petitioner's guilt or innocence, and in any event, both testified

that they would render a verdict based solely upon the evidence presented in Court. Accordingly, petitioner's claim is without merit.

### IV. *Change of Venue*

Petitioner has charged that his conviction and sentence lack fundamental fairness because the trial court refused a motion for a change of venue or venire despite what was alleged to be considerable, seriously prejudicial, pre-trial publicity. Amended Petition for Writ of Habeas Corpus at 12.

Pursuant to 28 U.S.C. § 2254(d), the federal habeas court must accord a presumption of correctness to the factual findings of the State courts, unless one of the eight exceptions enumerated justifies a federal court's disregard of that presumption. Section 2254(d)(8) provides that one such exception occurs when the federal court "on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record."

In *Briley v. Commonwealth of Virginia*, 221 Va. 532, 537–38, 273 S.E.2d 48, 52 (1980), the Virginia Supreme Court cited as weaknesses in petitioner's argument that:

[Petitioner] does not claim that any of the publicity about which he complains was either inaccurate or intemperate. [Citation omitted] Neither had he demonstrated "such a widespread feeling of prejudice on the part of the citizenry as [would have been] reasonably certain to prevent a fair and impartial trial" [Citation omitted]. Nor has he directed us to specific portions of the record "which would require a finding of constitutional unfairness as to the method of jury selection or as to the character of the jurors actually selected." *Dobbert v. Florida*, 432 U.S. 282 [97 S.Ct. 2290, 53 L.Ed.2d 344] ... (1977).

The defendant's complaint concerning pretrial publicity is no more than a claim that the sheer volume of the media cover-

---

5. One can appreciate petitioner's practical objection to such a juror, but the law does not recognize any legal objection.

age of his and his brothers' many crimes required a change in the location of his trial. Such a claim, standing alone, does not suffice to require a change of venue. *Dobbert v. Florida, supra,* 432 U.S. at 303 [97 S.Ct. at 2303]. . . .

The narrow question before this Court is whether the Supreme Court of Virginia's determination that pre-trial publicity did not prejudice petitioner by denying him an impartial jury is supported by the record.

In *Harris v. Pulley,* 692 F.2d 1189, 1199–1200 (9th Cir.1982), *remanded on other grounds,* —— U.S. ——, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), the Court of Appeals was presented with a claim that prejudicial pretrial publicity had denied petitioner an impartial jury and considered the question of what part of the record a federal habeas court must review in order to determine whether the record fairly supports the State court's factual determination.[6] The Ninth Circuit stated:

> Where prejudicial pretrial publicity is alleged, the relevant parts of the State court record, include, at a minimum, copies of the newspaper articles and, if available, any transcripts of television and radio broadcasts. Because a federal court sitting in habeas has a duty "to independently evaluate the voir dire testimony of the empaneled jurors" *Irvin v. Dowd,* 366 U.S. 717, 723 [81 S.Ct. 1639, 1643, 6 L.Ed.2d 751] . . . (1961), the entire transcript of the *voir dire* testimony should also be examined. It is only after examination of such relevant parts of the record that the district court can determine that the state court findings are supported by the record.

Before the Court at present is the evidence of pre-trial publicity stipulated to have been before the trial judge: a scrapbook of newspaper articles presented by petitioner in support of his motion for a change of venue or venire; transcripts of local television stations WTVR, WWBT, and Channel 8 [WXEX] covering the Briley trials; and eight affidavits by citizens in the community attesting to their belief that petitioner would be unable to have a fair trial in the community. Motions Transcript at 67–68. Also before the Court is petitioner's argument on behalf of his motion for a change of venue as well as the transcript of the complete *voir dire* of the venire.

For the reasons set forth below, we agree with the Supreme Court of Virginia that while publicity preceding petitioner's trial was extensive, it did not have that pervasive, inflammatory, corrupting character held by the Supreme Court decisions to be the *sine qua non* of a finding of such prejudice as would make the empaneling of an impartial jury impossible.[7]

A Fifth Circuit case which provides a useful paradigm for determining how a federal court goes about examining such claims is *Mayola v. State of Alabama,* 623 F.2d 992, 996 (5th Cir.1980), *cert. denied,* 451 U.S. 913, 101 S.Ct. 1986, 68 L.Ed.2d 303 (1981). Defendant Mayola was convicted and sentenced to life imprisonment for the first degree murder of an 11-year old Alabama boy. The kidnap-murder of his victim spawned a great deal of press attention; two local papers gave prominent and extensive written and photographic coverage to the crime and its subsequent investigation and prosecution. Attention thus generated was heightened by the theme of

---

**6.** I have serious doubt, that the Ninth Circuit's analysis correctly measures the impact of *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1982), but I think it the better part of wisdom to follow their lead in the absence of post-*Mata* authority to the contrary. Certainly, 28 U.S.C. § 2254(d)(8) does not place denial of a motion for change of venue based on extensive pre-trial publicity in a category different from other "determination[s] of factual issues." Like other factual determinations made by the State Court, that of the effect pre-trial publicity is

entitled to a presumption of correctness. Nevertheless, in order not to give petitioner yet another pretext to delay imposition of sentence, I will follow the *Pulley* procedure, recognizing it to be only suggestive not dispositive.

**7.** This Court has recently had occasion to review the law regarding pre-trial publicity in *Hargrave v. Landon,* 584 F.Supp. 302 (E.D.Va. April 12, 1984). The following analysis draws in part from that discussion.

sexual deviance pervading the newspaper coverage. Moreover, the day before the jury was to be empaneled the *Birmingham News'* lead front-page article featured an interview with Mayola in his jail cell. Mayola was reported as intending to repudiate the pleas of not guilty and not guilty by reason of insanity entered by his attorneys. The story included Mayola's personal view that he was not crazy and would deserve anything he got for his crime.

The Fifth Circuit pointed out that: "[O]ne seeking to have his conviction nullified on the ground that he was denied a fair trial to an impartial jury due to adverse pretrial publicity ordinarily must demonstrate an actual, identifiable prejudice attributable to that publicity on the part of members of his jury. *Irvin v. Dowd,* 366 U.S. 717, 723 [81 S.Ct. 1639, 1643, 6 L.Ed.2d 751] (1961)"; as the *Mayola* court went on to state, the sole exception to this conventional approach of showing actual prejudice was announced by the Supreme Court in *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), *Mayola* at 996.

In *Rideau,* petitioner, only hours after his arrest on charges of robbery, kidnapping, and murder, confessed, orally and in writing to these crimes. The morning thereafter, a sound film was made of an interview between petitioner and the sheriff; during that interview, petitioner admitted his guilt once more. The film was broadcast on a local television station for three days. The Supreme Court held:

> [I]t was a denial of due process of law to refuse the request for a change of venue after the people of Calcasieu Parish had been exposed repeatedly and in depth to the spectacle of Rideau personally confessing in detail to crimes with which he was later to be charged.... Any subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality.... [W]e do not hesitate to hold, without pausing to examine a particularized transcript of the *voir dire* examination of the members of the jury, that due process of

law in this case required a trial before a jury drawn from a community of people who had not seen and heard Rideau's televised "interview." *Rideau,* 373 U.S. at 726–727, 83 S.Ct. at 1419–20.

Justice Clark, however, joined by Justice Harlan, dissented:

> [The Court failed to establish] any substantial nexus between the televised "interview" and petitioner's trial which occurred almost two months later. Unless the adverse publicity is shown by the record to have fatally infected the trial, there is simply no basis for the Court's inference that the publicity, epitomized by the televised interview, called up some informal and illicit analogy to res judicata, making petitioner's trial a meaningless formality. *Rideau* at 728, 83 S.Ct. at 1420.

The difference between the majority and the dissent strikingly illustrates the attitudes of counsel for the petitioner, Linwood Briley, and his trial judge. Petitioner's attorneys moved in a special motions hearing conducted on 6 February 1980, for a change of venue, arguing that pre-trial publicity was so intense, so pervasive, that it must of necessity be prejudicial. The tenor of both the television transcripts as well as the newspaper articles presented to the trial court by the petitioner was informative, factual. None of the publicity proffered by then defendant Briley in any way appeared designed to inflame the mind of the community. True, the slayings alleged were themselves horrible; true, the publicity surrounding the earlier trials of petitioner and of his brother had been extensive. However, it is impossible to conceive of a situation where three brothers have been indicted for multiple rapes, armed robberies, first degree murder, and capital murder, and there not be extensive publicity. Counsel for petitioner takes the view that the situation presented in this appeal resembles that in *Rideau.* Specifically, she argues that the pretrial publicity was so inflammatory, so pervasive, so intense that it became a practical impossibility to empanel a fair jury. Hence, the holding in

*Rideau* must apply: where inflammatory pre-trial publicity has saturated the community, prejudice is presumed and the *voir dire* of the jury need not be examined. *Rideau* at 727, 83 S.Ct. at 1419.

Judge Spain, the trial court judge, took the position that Justice Clark did in the *Rideau* dissent: his belief was that pre-trial publicity notwithstanding, the proper procedure was to continue bringing before the court successive panels of veniremen until 12 impartial jurors could be selected. Even if we look to the *Rideau* majority and realize that there are situations where pretrial publicity has so corrupted the mind of the community that the defendant has been tried and found guilty in advance of the actual court proceeding, such has not been the case here. Nothing in the newspaper reports or the television transcripts reveal inflammatory publicity analogous to defendant Rideau's televised confession of the crimes for which he was later charged and to which he later pled not guilty. It is worth noting that "only in *Rideau* itself has the Supreme Court reversed a state court conviction on this basis of presumed prejudice deriving solely from pre-trial publicity." *Mayola* at 997.

In *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), six murders were committed near Evansville, Indiana; extensively treated by the news media in the locality, the crimes aroused great outrage throughout Vanderburgh County and Gibson County. Petitioner was arrested; shortly thereafter, the Vanderburgh County prosecutor and Evansville police issued press releases, also extensively publicized, which told of how petitioner had confessed to these six killings. Petitioner, having been granted a change of venue to Gibson County, sought another change of venue to some county far enough removed from the Evansville locality that a fair trial would not be prejudiced. The Supreme Court held that the increase of prejudice through pretrial publicity was "clear and convincing." *Irvin* at 725, 81 S.Ct. at 1644. The anticipated trial of petitioner had become so notorious that street corner opinions as to a suitable punishment were sought and recorded on the public thoroughfares by reporters and broadcast over local stations. Indeed, headlines reported that "impartial jurors are hard to find." *Irvin* at 727, 81 S.Ct. at 1645. Unlike *Rideau*, where the Supreme Court found it unnecessary to review the *voir dire* in the light of the prejudice presumptively created by pre-trial publicity, the Supreme Court actually examined jury selection process:

> An examination of the 2,783-page *voir dire* record shows that 370 prospective jurors or almost 90% of those examined on the point (10 members of the panel were never asked whether or not they had any opinion) entertained some opinion as to guilt—ranging in intensity from mere suspicion to absolute certainty. A number admitted that, if they were in the accused's place in the dock and he in theirs on the jury with their opinions, they would not want him on a jury.

> Here the "pattern of deep and bitter prejudice" shown to be present throughout the community, cf. *Stroble v. California*, 343 U.S. 181 [72 S.Ct. 599, 96 L.Ed. 872] ..., was clearly reflected in the sum total of the *voir dire* examination of a majority of the jurors finally placed in the jury box. Eight out of the 12 thought petitioner was guilty. With such an opinion permeating their minds, it would be difficult to say that each could exclude this preconception of guilt from his deliberations. The influence that lurks in an opinion once formed is so persistent that it unconsciously fights detachment from the mental processes of the average man. *Irvin* at 727, 81 S.Ct. 1645.

The Supreme Court found that petitioner had been denied due process of law in not being tried by an impartial jury; but it went on to discuss on the degree of pretrial publicity permissible *before* a jury was so influenced by pre-formed opinion it could not be said to be capable of impartiality:

> It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread, and diverse methods of com-

munication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin* at 722–23, 81 S.Ct. at 1642–43.

The facts of *Irvin* reveal such a complete contamination, not merely of the community, not just of the venire, but of the actual jury selected, that in no way could those jurors lay aside their opinions and arrive at an impartial verdict. The case here is not thus. The veniremen from whom Linwood Briley's jury were actually selected were consistently questioned as to whether or not they had ever heard of Linwood Briley; many had not. Of those who had heard of him, many had no clear idea of what he was charged with except that it was criminal and involved killing. All jurors actually selected asserted that they would be able to lay aside whatever vague or ill-formulated notions they may have had and reach a verdict based solely on the law and the evidence. See Appendix. There comes a point in a trial where the judge must believe what a venireman says under oath.

It is interesting to note that in both *Irvin* and *Rideau*, the defendant had either been seen in the act of confessing or police officials reported that he had confessed. There is not a sentence, not a word, indeed not a syllable, that Linwood Briley ever did other than assert his innocence.

In *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975), the Supreme Court specifically addressed the question of whether petitioner was denied a fair trial because jurors had learned of a prior felony conviction or of certain facts about the crime with which he was charged from news accounts. In *Murphy*, petitioner was convicted in Dade County, Florida, in 1970 of breaking and entering a home, while armed, with the intent to commit robbery and of assault with the intent to rob. Petitioner's arrest gained widespread press coverage because petitioner himself had been greatly in the news. First having been made notorious by participating in the 1964 theft of the Star of India sapphire from a New York Museum, he was labeled "Murph the Surf" by the media. Prior to the date set for petitioner's trial on the breaking and entering and assault charges, he was indicted on two counts of murder in Broward County, Florida. The Dade County court, however, found defendant mentally incompetent to stand trial and committed him to a hospital; the prosecutor *nol prossed* the robbery indictment. In August, 1968, Murphy was indicted by a federal grand jury for conspiring to transport stolen securities in interstate commerce. Having been found competent to stand trial, he was convicted on one count of murder in Broward County in March of 1969 and pleaded guilty to one count of the federal indictment in December of that same year. The indictment for robbery was refiled in August of 1969 and came to trial a year later. These events of 1968 and 1969 drew extensive press coverage. Each new case was considered newsworthy not only in Dade County but elsewhere.

Petitioner moved to dismiss the jurors chosen from a 78-person venire on the ground that they were aware of his earlier conviction of either the 1964 Star of India theft or the Broward County murder. This motion was denied as was his renewed motion for a change of venue based on allegedly prejudicial pretrial publicity. In *Murphy* as in the case at bar, we have defendants whose previous crimes were the subject of widespread publicity, and who moved the trial court either for a change of venire or venue, and whose motions were denied.

In *Murphy*, the Supreme Court reviewed its pre-trial publicity holdings and summarized:

The proceedings in these cases were entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob. They cannot be made to stand for the proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process. To resolve this case, we must turn, therefore, to any indications in the totality of circumstances that petitioner's trial is not fundamentally fair.

*Murphy* at 799, 95 S.Ct. at 2036.

The Supreme Court went on to establish a model by which this constitutional standard of fairness may be determined:

The constitutional standard of fairness requires that a defendant have "a panel of impartial 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. at 722 [81 S.Ct. at 1642].... Qualified jurors need not, however, be totally ignorant of the facts and issues involved. "To hold the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court" *Id.*, at 723 [81 S.Ct. at 1642–43] .... At the same time, the juror's assurances that he is equal to this task cannot be dispositive of the accused's rights, and it remains open to the defendant to demonstrate "the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality." *Ibid.*

*Murphy* at 800, 95 S.Ct. at 2036.

■ The "Watergate" trials of Presidential advisors Haldeman, Ehrlichman, and Mitchell place the entire issue of change of venue based on pre-trial publicity in sharp perspective. In the most highly publicized case in the history of the world, *United States v. Haldeman*, 559 F.2d 31, 59 (D.C. Cir.1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250; *reh. denied*, 433 U.S. 916, 97 S.Ct. 2992, 53 L.Ed.2d 1103 (1977), the D.C. Circuit examined the extensive pre-trial publicity surrounding the trials of Harry R. Haldeman, John D. Ehrlichman, and John N. Mitchell for conspiracy, obstruction of justice, and making false statements to the Federal Bureau of Investigations as well as to the Senate Committee on Presidential Campaign activities. Appellants had raised the contention that pre-trial publicity was so pervasive and so harmful to them that it must be assumed they could not receive a fair adjudication of the charges against them at the time and in the place which they were tried.[8]

The D.C. Circuit in *Haldeman* looked initially at the right to a fair trial by a panel of impartial, "indifferent," jurors. *See Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). The *Haldeman* court spoke of the necessity to refer to the *voir dire* of the jury in order to establish such impartiality but noted that in extreme circumstances prejudice to the defendants' rights might be presumed. The Court of Appeals also remarked that the Supreme Court has reversed a conviction because it presumed pre-trial publicity had made a fair trial impossible only once: in the case of *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963).

Having looked at the "Watergate" articles submitted by the appellants, the *Haldeman* court held:

[W]e find that the pre-trial publicity in this case, although massive, was neither as inherently prejudicial nor as unforgettable as the spectacle of Rideau's dramatically staged and broadcast confession. It is true that some of the pieces contained in the extensive collection of

---

**8.** Federal courts can establish more rigorous standards for their own governance than those minimum guarantees of fairness which the Constitution imposes on the State courts. It is this latter, less strict, standard which must be applied by a federal habeas court when looking at State court proceedings.

articles governed by appellants are hostile in tone and accusatory in content. The overwhelming bulk of the materials submitted, however, consist of straightforward, unemotional, factual accounts of events and of the progress of official and unofficial investigations. In short, unlike the situation faced by the Court in *Rideau*, we find in the publicity here no reason for concluding that the population of Washington, D.C., was so aroused against appellants and so unlikely to be able objectively to judge their innocence on the basis of the evidence presented at trial that their due process rights were violated by the District Court's refusal to grant a lengthy continuance or a change of venue prior to attempting selection of a jury.[9]

*Haldeman* at 61–62.

Manifestly, if a Washington, D.C., jury could be empaneled, capable of the necessary impartiality, in order to assess the charges against Haldeman, Ehrlichman, and Mitchell, in the face of the savage onslought of publicity, surely an impartial jury could be found to assess the charges against Linwood Briley. As we have seen, as the Supreme Court of Virginia pointed out, the publicity was massive but factual, not encompassing and accusatory, widespread in the local area, not a worldwide news phenomenon, straightforward, instead of politically tainted, in its coverage.

■■■ At the outset, it is presumed that a prospective juror may judge impartially; even if there has been extensive pretrial publicity, even if the juror actually has formed an opinion, his initial state of mind, standing alone, does not rebut that presumption. If the juror is able to lay aside the opinion he has formed, if he is able to put from him any predisposition to find the defendant guilty based on his reading of newspapers or viewing of television, his impartiality remains intact. But if a venireman, who has formed such an opin-

ion, merely asserts his impartiality in the face of circumstances, such as extensive pretrial coverage, which might make that impartiality suspect, it is open to the defendant to demonstrate that the opinion the venireman has formed will persist and will prevent him from reaching a fair verdict based solely on the law and the evidence as they are presented in open court.

■■■ In the case at bar, the Court has examined pre-trial publicity stipulated to have been before the trial judge. Here, unlike *Rideau*, we have no publicized confession of defendant; nor have there been statements by the jurors, as in *Irvin*, that they would need actual evidence to overcome their belief in the defendant's guilt. It remains then to scrutinize the *voir dire* of the jury actually chosen to see whether or not the defendant, on whom the burden then rested, was able to demonstrate the actual existence of an opinion which wiped out the presumption of impartiality accorded that juror. The Court has done this[10] and is satisfied that a jury free from constitutional objection was sealed.

It is patently obvious from the transcript that the trial court made a conscientious effort when empaneling all three groups of veniremen to ascertain if the venire collectively had formed an opinion as to the guilt or innocence of the accused. Moreover, both prosecution and defense counsel carefully questioned each member of the venire to determine whether or not there was cause for their dismissal. Overwhelmingly, the reason for which veniremen were stricken for cause was religious objections, or personal objections, to imposition of the death penalty.

An examination of the *voir dire* of the entire venire, with particular attention paid to the *voir dire* of the twelve actually selected as jurors, does not reveal the deepseated prejudice which the Supreme Court

---

9. If pre-trial publicity in *Haldeman* was insufficient for a change of venue out of Washington, D.C., it is difficult, nay, impossible to conceive of a case where a change would be required.

The drama of *Rideau* was a kindergarten playlet compared to Watergate's national tragedy.

10. The Court's detailed review is set forth in Appendix I.

has found necessary in order to declare that an impartial jury could not be found. Nor does the pretrial publicity adduced by petitioner reveal the wide-spread prejudice, the "carnival atmosphere," that in and of itself justifies granting a change of venue, without such examination of the *voir dire* to discern whether or not an impartial jury was actually empaneled. Here, although jurors had read of the case in the newspapers, no fixed opinions had been formed. No inability to lay aside such opinion, even if it existed, was manifest in any of the twelve who determined that Linwood Briley was in fact guilty and should receive the death penalty. The Supreme Court of Virginia spoke well when it said with regard to the matter of pretrial publicity:

> The defendant's complaint concerning pretrial publicity is no more than a claim that the sheer volume of the media coverage of his and his brothers' many crimes required a change in the location of his trial. Such a claim, standing alone, does not suffice to require a change of venue. *Dobbert v. Florida*, 432 U.S. 282, 303 [97 S.Ct. 2290, 2303, 53 L.Ed.2d 344] (1977)....

*Briley* 273 S.E.2d at 52.

Accordingly, having examined all of the pretrial publicity stipulated to have been before the trial judge, having examined the *voir dire* of the jury, I find no constitutional infirmity in the trial judge's denial of the motion for change of venue or venire.

## V. *Brady*

Petitioner claims that the Commonwealth failed to reveal to petitioner the existence of a transcript of tape recordings and letters threatening the family of witness Duncan Meekins. (Claim 3) Respondent argues that in the face of petitioner's general request for exculpatory evidence, the Commonwealth was not required to reveal the transcript and letters in question.

In *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or the bad faith of the prosecution." *Id.* at 87, 83 S.Ct. at 1196–97. In *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the *Brady* rule was both refined and expanded. The two decisions were explained in *Chavis v. State of North Carolina*, 637 F.2d 213, 222 (4th Cir.1980).

> Under *Brady* the suppression of exculpatory evidence constitutes a denial of due process vitiating a conviction in three distinct types of situations: (1) where the prosecution's case includes perjured testimony, the prosecution knew or should have known of the perjury but failed to disclose the fact, and there is any reasonable likelihood that the false testimony could have affected the judgment of the jury; (2) where the defense has requested but has been denied the production of specific evidence material to the issue of guilt; and (3) where the defense has either made no request or has made only a general request for exculpatory evidence but the prosecution suppresses evidence of sufficient probative value to create a reasonable doubt of the guilt of the accused where none theretofore existed.

*Id.* at 222–23.

In this case the defense made a general request for all exculpatory evidence, *see* Motion, *Commonwealth v. Briley*, No. F–80–229 and F–80–230 (Circuit Court of the City of Richmond, Division I, 30 January 1980), and therefore, this is the third type of situation described above. In this situation, a "prosecutor will not have violated his constitutional duty of disclosure unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial." *United States v. Agurs*, 427 U.S. 97, 108, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976). In determining the proper standard of materiality of undisclosed evidence, the Court stated that constitutional error had been committed "if the omitted evidence creates a reasonable doubt that did not otherwise exist." *Id.* at 112, 96 S.Ct. at 2402. The Court has recently re-emphasized the fact that mate-

riality of the withheld evidence must be evaluated in the context of the entire record. *United States v. Valenzuela-Bernal,* 458 U.S. 858, 874, n. 10, 102 S.Ct. 3440, 3450, n. 10, 73 L.Ed.2d 1193, 1207, n. 10 (1982).

After review of the voluminous record in this case, I hold that petitioner's claim must fail. Petitioner argues that the letters and transcript are "doubly exculpatory" in that they implicate others in the crime and in that they could have been used to impeach the testimony of Duncan Meekins.

Petitioner's argument that the letters and transcript implicate someone other than the Brileys in the crimes is tenuous at best. Although the letters were signed by other than one of the Brileys, and Meekins could not identify the telephone caller as one of the brothers, Federal Transcript at 72–73, Meekins testified that the threats made him fearful of the Brileys. Federal Transcript at 65–66. It is unreasonable to believe that a third party committed these murders and threatened Meekins' family in an effort to coerce Meekins into not testifying. Common sense indicates that had some third party committed the crimes, he or she would have been happy for the Brileys to take the "rap" for them. The threats may have come from an intermeddler, in which case they had no probative value. The more likely explanation of the origin of the letters is that they were initiated by a friend of the Briley family who was attempting to save Linwood in this case and the other brothers in the numerous other cases in which they were involved.

Further, the suggestion that a third party killed Gallaher is inconsistent with the objective facts adduced at trial. Petitioner's fingerprints were found in Gallaher's car; when arrested petitioner was wearing Gallaher's ring; Gallaher's watch was found in the defendant's home; and in his testimony at trial the petitioner admitted that he and Meekins stripped the car of its parts and that he bought the ring and watch from Meekins. *Briley v. Common-*

*wealth,* 221 Va. 532, 273 S.E.2d 48, 50–51 (1980).

Petitioner's second argument is that the letters and transcript could have been used to impeach the testimony of Meekins and thereby create a reasonable doubt which did not otherwise exist. Petitioner's scenario on this point appears to be as follows: Meekins could have testified that he was afraid that the Brileys might harm him were their violence not checked, and this was one reason Meekins testified for the government. Counsel could have shown that this fear was unjustified by introducing the letters, which threatened Meekins only if he *did* testify. This speculation on the part of petitioner's present counsel cannot rise to the level of a constitutional deprivation. Further, Meekins' credibility was sufficiently attacked at trial. Any incremental undermining of Meekins' credibility which might have resulted would not have created a reasonable doubt which did not already exist.

 Also militating against petitioner's argument is the fact that the letters are unaccompanied by any indicia of reliability. The law in Virginia is that a declaration against penal interest made out of Court is admissible only upon a showing that the declaration is reliable. *Ellison v. Commonwealth,* 219 Va. 404, 408, 247 S.E.2d 685, 688 (1978). As there was no extrinsic or intrinsic evidence to support the reliability of the letters, they were not admissible at petitioner's trial. The admissibility of undisclosed evidence may be considered in determining materiality under *Brady.* In *Brady,* the defendant had been denied access to a statement in which a co-defendant admitted the actual homicide. *Brady,* 373 U.S. at 84, 83 S.Ct. at 1195. The Court found that the failure to disclose the confession was a violation of the due process clause. *Id.* at 86, 83 S.Ct. at 1196. Defendant was granted a new trial as to sentencing only, however, because the confession would have been inadmissible at trial on the issue of guilt or innocence. *Id.* at 90, 83 S.Ct. at 1198.

■ Because the letters in the instant case would have been inadmissible and because neither the letters nor the transcript create a reasonable doubt which would not otherwise have existed in the context of the entire record, this claim is without merit.

## VI. *The Plea Agreement*

■ Petitioner argues that the Commonwealth failed to reveal to the jury the true terms of Meekins' plea bargain with the Government. This claim must be examined in the light of the Supreme Court's holding in *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). In *Giglio*, the Government failed to disclose a promise of leniency made to a key government witness who had testified, despite rigorous cross-examination by defense counsel, that no promise had been made to him. The Court held that where the reliability of a witness may be determinative of the guilt or innocence of a defendant, nondisclosure of evidence that affects credibility is a denial of fundamental fairness required by the due process clause. In other words, confronted by a prosecution witness who denies the existence of a plea agreement, or who grossly misrepresents its extent, and who conveys these lies or misimpressions to the jury, the prosecution has a responsibility, quite independent of what defense counsel may or may not do on cross-examination, to reveal the actual plea agreement to the Court and the jury.

The narrow question thus presented by the facts of the instant case is whether or not, applying the *Giglio* standard, it can reasonably be said that the version of Duncan Meekins' plea agreement which reached the jury was (1) false and (2) if so, whether there was "reasonable likelihood" that disclosure of the "true" agreement would have affected the judgment of the jury. *See also Napue v. Illinois*, 360 U.S. 264, 271, 79 S.Ct. 1173, 1178, 3 L.Ed.2d 1217 (1959).

Looking at the plea agreement, we must bear in mind that at the time Duncan Meekins was testifying the plea agreement had not reached its final form. Nor indeed, given its terms, could the effects of the final agreement be known until all of the trials were over. There actually had existed three plea agreements with Duncan Meekins: the first of these was verbal and was the one under which he testified; the second was executed on 29 January 1981 but was not accepted by the Court and was destroyed. The third, also written, was the one finally accepted by the Court on 29 January 1981.

The rejected plea agreement had imposition of sentence for Meekins for the murders of Garner and Gallaher suspended and the sentence for the murder and robbery of Harvey W. Wilkerson was life for the murder and 80 years for the robbery. Response to Interrogatory Numbered 6, at page 14. Petitioner argues that the verbal agreement, under which Meekins testified, was the prototype of the first—rejected—written agreement and, like it, promised a suspended sentence for Gallaher's murder. Thus, runs the argument, Meekins testimony was a lie:

Question [Mr. Beard]—You were involved in this particular crime, is that correct?

Answer [Meekins]—Yeah.

Question [Mr. Beard]—You have been charged, is that correct?

Answer [Meekins]—Yeah.

Question [Mr. Beard]—And you are testifying for the State, is that correct?

Answer [Meekins]—I don't know who I'm testifying for.

Question [Mr. Beard]—These gentlemen here asked you to testify on their behalf and the State's behalf, is that correct? (Denoting Mr. Rice and Mr. VonSchuch)

Answer [Meekins]—They told me to testify on my behalf.

Question [Mr. Beard]—Okay. Well, on your behalf, has anyone made you any promises one way or the other?

Answer [Meekins]—Promises? No.

Question [Mr. Beard]—Promises of leniency, promises of less punishment?

Answer [Meekins]—They said they would make a plea agreement. They didn't say they was going to promise nothing.

Question [Mr. Beard]—Do you know what the plea agreement is?

Answer [Meekins]—Yeah, that I couldn't get no more time than anybody else in this case, providing I tell the truth and testify.

Question [Mr. Beard]—That is the extent of the agreement?

Answer [Meekins]—Huh?

Question [Mr. Beard]—Is that the extent of the agreement?

Answer [Meekins]—For this case, yeah.

Question [Mr. Beard]—I am talking about any agreement with them for whatever you have to do for it. I just want to know, what agreement do you have with these people?

Answer [Meekins]—That's the agreement.

Question [Mr. Beard]—Nothing else?

Answer [Meekins]—Nothing else.

Transcript at 535–36.

In a bench conference following this exchange, the terms of Meekins' verbal plea agreement were made plainer:

Mr. Cowan: ... He is asking what his plea agreement is.

The Court: He has told you, in this case, as I understand—is that the agreement in this case?

Mr. Beard: Did you limit that portion to this case?

Mr. Rice: His plea agreement, as I told Frank, he is charged with a capital murder, and the Commonwealth will not seek the death penalty on that capital murder.

The Court: Is that another case?

Mr. Rice: Yes, sir. In any other cases, he is not to get any more punishment that [sic] anybody else. In this case, he does not qualify for capital punishment.

Transcript at 538–39.

The colloquy between counsel for petitioner and the Commonwealth's Attorney, Mr. Rice, at the federal habeas hearing reveals that the verbal plea agreement contained no reference to a suspended sentence:

Question [Ms. Wyatt]—You said there was a verbal agreement. I'm saying this is accurate. The first plea agreement was similar to the written plea agreement of January 29, which was not accepted; the only difference in the first plea agreement, that which you entered in October, and the one finally accepted by the court, is that the prior plea agreement had imposition for sentence for Meekins on the murder of Garner and Gallaher suspended and the sentence for Harvey Wilkerson was life in the penitentiary for the robbery, on pages 13 and 14 of the interrogatories; is that correct?

Answer [Mr. Rice]—No. The initial plea agreement was that Duncan Meekins, assuming he had fulfilled his—what he was supposed to do, would get a life sentence for the murder, get a life sentence for the murder of Harvey Wilkerson and a term of years.

Now, the eighty years, or whatever that totals up, like I say, I don't know—that figure of number of years was worked out at the end of the trials in comparison with what happened in the other trials and what the sentences were.

Federal Habeas at 39–40.

On examining petitioner's argument further, we find in the first place that Duncan Meekins was not presented to the jury as a disinterested witness. Unlike the witness in *Giglio*, who flatly lied on the witness stand, and insisted that no promises of any sort whatsoever had been made to him, Duncan Meekins not only admitted to a plea agreement but admitted to its terms as they applied to the trial for the murder of Johnny Gallaher.

What petitioner seeks additionally to establish is that the prosecutor, knowing the full extent of the agreement with Meekins, deliberately misled the jury in closing argument. What petitioner objects to most ar-

dently is the following language used by the Commonwealth's Attorney in his closing argument:

> Where Linwood Briley made his mistake is that he ran with a 16-year-old boy, because if anybody is going to break with a case like this, it is going to be a juvenile. That was the fatal mistake. Mr. Gallaher's fatal mistake was going outside. Mr. Briley's fatal mistake was running with a boy nine years younger than he was, because that is who talked. That is who gave the information that led to his own arrest, Duncan Meekins. He is the one who told the detective that he was involved in it. And at that point in time, there was no reason on this earth for him to do that because Linwood Briley was arrested and his statement to the police was that A.C. did it. Duncan Meekins was not incriminated at all. And yet, they want you to believe that he told the detective division of his involvement in this case so he could testify against Linwood Briley and get no more time than anybody else. Now that is a heck of a deal.

Transcript at 793–94.

This statement must be taken in context. The prosecution was at this point attempting to rehabilitate Duncan Meekins by pointing out that his plea agreement with the Commonwealth was not the only factor to be considered in assessing Meekins' credibility. To validate that claim, the prosecution made reference to Duncan Meekins' voluntarily giving the information which led to his own arrest. It is in this regard that petitioner seriously misreads the prosecution's closing argument as referring to the voluntariness of Meekins' testimony at trial. The defense attorney in his closing argument after having stated, "Duncan Meekins is testifying before you on a plea agreement—on a plea agreement to save his own self," added "His honor has instructed you as to the law, and you must receive his evidence with great caution. . . . His honor has instructed you that Duncan Meekins' testimony, unsupported, has to be taken with great caution. Duncan Meekins comes to you in this courtroom and his evidence is to be received with great caution." Transcript at 798–99.

In short, the fact of a plea agreement was before the jury, replete with whatever possibility for damaging the credibility of Duncan Meekins it might have. The closing argument which petitioner finds so offensive, was an effort on the part of the Commonwealth to rehabilitate that witness by showing the voluntariness, *not* of his testimony against Linwood Briley, but the voluntariness of his discussions with the police which led to his own arrest.

The difference between what was presented to the jury and the aggregate plea bargain is what concerns me. Meekins told the jury the truth about the plea bargain as it applied to the Gallaher murder. What he did not tell the jury was that the Gallaher terms also applied to the other Briley murders so that his aggregate exposure to imprisonment could not be determined until all the cases were disposed of. Petitioner argues this non-disclosure entitles him to a writ.

In support of petitioner's position, he brings to the Court's attention, a long line of cases standing for the proposition that where the prosecution permits a witness to lie to the jury, and where the credibility of that witness is a key factor in proving defendant's guilt, the prosecution is obliged to correct that witness's testimony; otherwise the defendant has been deprived of a fair trial. Most instructive in this regard is, *Boone v. Paderick,* 541 F.2d 447 (4th Cir.1976), *cert. denied,* 430 U.S. 959, 97 S.Ct. 1610, 51 L.Ed.2d 811 (1977).

Like Duncan Meekins, Eugene Hargrove was the witness upon whom the prosecution in *Boone* depended in order to prove defendant guilty of armed robbery and statutory burglary. Witness Hargrove was promised by the investigating officer that he would not arrest Hargrove for burglary or for any other offenses which he knew Hargrove to have committed and that he would use his influence with the Commonwealth Attorney in order to see that Hargrove would not be prosecuted. De-

fendant Boone's attorney was never informed by the prosecutor or the officer or anyone else of the representations made to Hargrove; at trial, however, he apparently suspected something and attempted to prove Hargrove's bias. But counsel got nowhere in his attempt to uncover the prosecutorial bargain. Imprisoned for life plus 20 years for armed robbery and statutory burglary, Boone unsuccessfully petitioned the district court for a writ of habeas corpus. The Fourth Circuit, in reversing and remanding, stated at 451:

> The controlling issue and one which we find difficult, is the materiality of the evidence withheld. Under *Giglio*, "[a] new trial is required if 'the false testimony could ... in any reasonable likelihood have affected the judgment of the jury....'" *Id.* at 154 [92 S.Ct. at 766].... In determining that issue, we must examine both the importance of Hargrove's testimony which would be affected by his credibility, and the weight of the independent evidence of guilt.

In making the determination that Hargrove's testimony was the *sine qua non* of the State's case, the Fourth Circuit held at 453:

> The task of determining whether there is "reasonable likelihood" that evidence of the promise of favorable treatment to Boone would have affected the judgment of the jury is not an easy one.... We believe, however, that with the evidence of Coffield's promise and without the prosecutor's misrepresentation that there was no promise of favorable treatment and his misrepresentation that Hargrove testified against his penal interest and out of a sense of conscience, which buttressed his credibility, there is reasonable likelihood that the jury would have reached a different result. . Only Hargrove testified concerning the details of the robbery from direct observation; his testimony was critical to the conviction. Without him the jury would have known only of vague admissions and weak circumstantial evidence linking him to the robbery.

As we have noted, Meekins told the jury the truth about the plea bargain as it applied to the Gallaher murder. What he did not tell the jury was that the Gallaher terms also applied to the other Briley murders so that his agregate exposure to imprisonment could not be determined until all the cases were disposed of. Nor was the jury explicitly aware that the State was not, as part of that bargain, seeking the death penalty for Meekins in another slaying where he was the triggerman. Petitioner argues this nondisclosure entitles him to a writ.

Thus, the question is whether Duncan Meekins' failure to disclose the full extent of his plea agreement in "any reasonable likelihood" affected the judgment of the jury. At the outset a distinction between the situation presented in this appeal from that in the *Giglio-Napue* line of cases must be drawn:

(1) The witness, Duncan Meekins, was not lying; he was presenting that portion of his plea agreement which related to the Gallaher trial.

(2) Opposing counsel and the trial judge knew the full extent of the plea bargain.

(3) Instead of a prosecutor failing to disclose a plea agreement denied by a lying witness, we have a defense attorney, with knowledge of the full plea agreement, allowing partial, rather than full, disclosure for sound strategic reasons.

(4) No effort was made by the prosecution to pass-off the witness as unbiased.

These distinctions, in toto, mandate rejection of petitioner's argument that the partial disclosure of Duncan Meekins' plea agreement with the Commonwealth denied petitioner a fair trial. We are informed in this holding by a recent District of Columbia Circuit decision, *United States v. Iverson,* 648 F.2d 737 (D.C.Cir.1981); we are bound by the Fourth Circuit holding in *United States v. Meinster,* 619 F.2d 1041 (4th Cir.1980). In *Iverson,* on petition for rehearing, the Court addressed the limited application of the *Giglio-Napue* doctrine that where a witness has lied as to the

existence of a plea agreement, it is the prosecution's responsibility to correct whatever misapprehension the jury may have at that moment. Failure to do so entitles petitioner to a new trial if there is "any reasonable likelihood" the jury could have been influenced by the revelation of the actual bargain. The D.C. Circuit provided an instructive summary of the law in this area:

> The early decisions dealing with the prosecutor's responsibility to disclose exculpatory information generally proceeded on the assumption that defense counsel had no knowledge of the critical information. Since then, the doctrine has been expanded to include situations in which the defense counsel, although possibly aware of the relevant information, was unable, as a practical matter, to use it to cast doubt upon contrary evidence proffered by the government or its witnesses. [*See, e.g., United States v. Sanfilippo,* 564 F.2d 176, 178 (5th Cir.1977) ]. On the other hand, other recent decisions have indicated that no violation of due process results from prosecutorial nondisclosure if defense counsel both knows of the information and is able to make use of it but still chooses, for tactical reasons, not to do so. [*See, e.g., United States v. Meinster,* 619 F.2d 1041 (4th Cir.1980) ] . . . .
> We believe the distinction made by the cases to be a sound one, and accordingly we hold that, absent unusual circumstances, the right of the defendant to disclosure by the prosecutor is deemed waived if defense counsel with actual knowledge of the plea agreement or sentencing status information chooses not to present such information to the jury.

*Iverson* at 738–39.

In *Meinster,* adverted to by the D.C. Circuit and controlling for this Court, chief witness for the prosecution Pervis testified falsely in a North Carolina trial as to a "deal" he had with the Florida authorities. The Fourth Circuit held:

> [W]e think appellants' prior knowledge of the Florida "deal" precludes our granting the relief they seek. On or before the first day of trial, defense counsel . . . was informed there was a deal in Florida . . . . Defense counsel took no further action on the matter, and made no attempt to obtain as a witness any of the Florida officials or take the matter to the trial judge. Thus, defendants had information from the very office that made the "deal" with Pervis, yet were content to accept—until after trial—the denials of the North Carolina prosecutor. We think appellants waived their objection to Pervis' testimony by waiting until after trial to bring the question to the attention of the trial judge. [citations omitted.] *Meinster* at 1045.

Accordingly, I hold that petitioner's strategic decision not to go into the particulars of Duncan Meekins' full plea agreement, when he had knowledge of that full plea agreement, bars him at this time from alleging that the full plea agreement was not before the jury.

Petitioner argues that defense counsel's failure to bring out all the details of the plea agreement was not a result of a strategic decision but was a result of the trial court's ruling. At no point did the trial court refuse to allow the plea agreement with Duncan Meekins to be explored. *See* in this regard this Court's findings made on 31 August 1983. Federal habeas at 158–61. Rather, the trial court simply pointed out to defense counsel that if he elected to pursue the full plea agreement, the Commonwealth would be permitted to explore details of other crimes in which petitioner had been implicated. Transcript at 539–40. The choice was petitioner's; he must now abide its consequences. It probably was a wise choice in any event.

## VII. *Proportionality*

■ Petitioner charges that his sentence is unconstitutional in that the Virginia Supreme Court has failed to review such sentences for proportionality, uniformity, and overall equality and fairness. Proportionality review by an appellate court has been deemed important in insuring that the sentence was not imposed in an arbitrary

or capricious manner. *See Gregg v. Georgia*, 428 U.S. 153, 206, 96 S.Ct. 2909, 2940, 49 L.Ed.2d 859 (1976), *reh. denied*, 429 U.S. 875, 97 S.Ct. 197, 50 L.Ed.2d 158 (1977); *Proffitt v. Florida*, 428 U.S. 242, 258, 96 S.Ct. 2960, 2969, 49 L.Ed.2d 913 (1976), *reh. denied*, 429 U.S. 875, 97 S.Ct. 198, 50 L.Ed.2d 158 (1977); *Barfield v. Harris*, 719 F.2d 58, 62 (4th Cir.1983). However comparative proportionality review of a death sentence with penalties imposed in similar cases is not constitutionally required. *Pulley v. Harris*, —— U.S. ——, ——, 104 S.Ct. 871, 876, 79 L.Ed.2d 29, 36 (1984).[11]

To the extent that petitioner is arguing that his sentence, like that in *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), *reh. denied*, 456 U.S. 1001, 102 S.Ct. 2286, 73 L.Ed.2d 1296 (1982), is inherently disproportionate and should be overturned because there was no mental or physical torture of the victim, Second Reply to Motion to Dismiss at 26, the claim is without merit. *Godfrey*, properly viewed, is not a proportionality case but instead is a case which turns on statutory construction. The Court in *Godfrey* held that the Georgia Supreme Court had not applied a constitutional construction of the statutory phrase " 'outrageously or wantonly vile, horrible or inhuman in that [they] involved ... depravity of mind ...' " by affirming the sentence of death under these facts. *Id.* 446 U.S. at 432, 100 S.Ct. at 1767. As is discussed below in Section IV, the construction of the statute rendered in this case is constitutional. *Godfrey* considered proportionality review only to the extent that it noted that the Georgia statute required such a review and that the

Georgia Supreme Court had done such a review. *Id.* at 427, 100 S.Ct. at 1764.

## VIII. *Failure to Give the Jury an Instruction as to the Lesser Included Offense of First-Degree Murder*

Petitioner argues that the trial court erroneously refused a lesser included offense instruction, namely that the murder occurred after the robbery was over and hence was not capital. It is necessary at this point to examine what the trial court ruled and what it did not rule:

> ... [T]he Court did not rule as a matter of law that the killing of Gallaher occurred in the commission of robbery. Out of the hearing of the jury, the Court did rule that, if the jury believed the defendant robbed Gallaher at the Log Cabin, then, as a matter of law, the robbery continued until Gallaher's subsequent death on Mayo Island. The record does not reveal, however, that this ruling was ever communicated to the jury. Further, contrary to what the defendant suggests, the lower court did not prohibit counsel from arguing to the jury that the killing did not occur in the commission of robbery.

*Briley v. Commonwealth*, 221 Va. 532, 540–41, 273 S.E.2d 48, 53–54 (1980).

The record shows the trial court gave an instruction telling the jury that the burden was upon the Commonwealth to prove, *inter alia*, the killing of Gallaher occurred during the commission of robbery and that, in the failure of this burden of proof, the jury should find the defendant not guilty of capital murder.[12] The Court also instruct-

---

11. Even if an error under Virginia's statute, § 17–110.1, could be sufficiently egregious to amount to a denial of due process, such is not the case here. The Virginia Supreme Court explicitly addressed the question of proportionality review on appeal. *Briley v. Commonwealth*, 221 Va. 532, 273 S.E.2d 48, 57 (1980).

12. Transcript at 757–58. The instruction reads: "The defendant is charged with the crime of capital murder. The Commonwealth must prove beyond a reasonable doubt each of the following elements of that crime:
 (1) That the defendant killed John Harvey Gallaher; and

(2) That the killing was willful, deliberate and premeditated;
(3) That the killing occurred during the commission of robbery while the defendant was armed with a deadly weapon."
"If you find from the evidence that the Commonwealth has proven beyond a reasonable doubt each of the above elements of the offense as charged, then you shall find the defendant guilty and shall not fix the punishment until your verdict has been returned and further evidence is heard by you."
"If you find the Commonwealth has failed to prove any one or more of the elements of the offense beyond a reasonable doubt, then you

ed the jury as to the offense of robbery.[13]

And, in the discussion between Court and counsel concerning instructions, the trial judge made clear that defendant's counsel could argue to the jury that the Commonwealth had failed to prove "the elements of the crime" of capital murder, including the element "that the killing occurred during the commission of robbery." Transcript at 739. The Court only prohibited defense counsel from arguing that the robbery, if it occurred, terminated in legal contemplation with the conclusion of the event at the Log Cabin Restaurant.

With this clarification, it was obvious to the Supreme Court of Virginia that the trial court took the position that the jury should be permitted only two options, *viz.*, to find the defendant guilty of capital murder or to acquit him. *Briley v. Commonwealth*, 221 Va. 532, 273 S.E.2d 48, 53–54 (1980).

Petitioner argues that the trial court's ruling constituted error of constitutional proportions. In fact, the trial court had before it uncontradicted testimony by the Commonwealth which showed conclusively that the violence against the victim Gallaher and the trespass to his automobile combined and continued unabated from the time when his car was taken from the Log Cabin Restaurant until he was killed on Mayo Island fifteen to twenty minutes later. The trial court found, as a matter of law, that the entire sequence of events amounted to an ongoing robbery during which the death of victim Gallaher took place. Transcript at 735–36. The Virginia Supreme Court concurred in this view. *Id.* 273 S.E.2d at 55.

Given this legal posture the question that must be addressed is whether the Supreme Court's determination that the robbery continued until Gallaher's subsequent death on Mayo Island is a matter of law or of fact. If it is a matter of fact, then under 28 U.S.C. § 2254(d) a presumption of correctness is established in favor of "a determination after a hearing on the merits of a factual issue made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia...." This presumption of correctness will be overturned only upon a showing that one of the eight exceptions to it apply. Absent such showing, the State court's factual determination is binding on this Court. *Sumner v. Mata*, 449 U.S. 539, 547, 101 S.Ct. 764, 769, 66 L.Ed.2d 722 (1982); *Marshall v. Lonberger*, 459 U.S. 422, 103 S.Ct. 843, 74 L.Ed.2d 646 (1982).

It is true that the trial court and the Supreme Court of Virginia characterize their findings as ones of law; however, the Supreme Court addressed a similar characterization in *Marshall v. Lonberger*, 459 U.S. 422, 103 S.Ct. 843, 74 L.Ed.2d 646 (1982), and recharacterized the State court's holding not as one of law but as one of fact and applied § 2254(d). In *Lonberger*, petitioner claimed error in the admission of a previous conviction for attempted murder in Illinois into his trial for aggravated murder under an Ohio statute. The evidence before the Ohio jury was that petitioner had voluntarily pled guilty to the Illinois charge. The question before the federal habeas Court was whether or not

---

shall find the defendant not guilty of capital murder."

**13.** Transcript at 759–60. The instruction reads: "Robbery is an element of the offense of capital murder for which the defendant is charged. The Commonwealth must prove beyond a reasonable doubt each of the following elements of the crime:
(1) That the defendant intended to steal; and
(2) That United States currency and property was taken; and

(3) That the taking was from John Harvey Gallaher or in his presence; and
(4) That the taking was against the will of the owner or possessor; and
(5) That the taking was accomplished by violence or threat of bodily harm."
"If you find from the evidence that the Commonwealth has proven beyond a reasonable doubt each of the above elements of the offense of robbery, then you shall find that a robbery did occur."

evidence of the prior conviction had been properly admitted. If the guilty plea were truly voluntary, the evidence was appropriately admitted; if the guilty plea had been tendered unknowingly, the conviction could not stand and the evidence of that conviction could not be admitted to the Ohio proceedings. The Supreme Court stated at 431, 103 S.Ct. at 849, 74 L.Ed.2d at 657:

> We entirely agree with the Court of Appeals for the Sixth Circuit that the governing standard as to whether a plea of guilty is voluntary for purposes of the federal constitution is a question of federal law ... and not a question of fact subject to the requirements of 28 U.S.C. § 2254(d). But the question of historical fact which has dogged this case from its inception—what the Illinois records show with respect to respondent's 1972 guilty plea, what other inferences regarding those historical facts the Court of Appeals for the Sixth Circuit could properly draw, and related questions— are obviously questions of "fact" governed by the provisions of § 2254(d).

A similar analysis applies to the case at bar. It is a question of fact whether or not Gallaher was robbed of his wallet at the Log Cabin Restaurant; it is a question of fact whether defendant then took Gallaher's automobile; it is a question of fact whether defendant drove to Mayo Island in Gallaher's car and parked on the grounds of a paper company; it is a question of fact whether defendant and Duncan Meekins forced Gallaher from the car; it is a question of fact whether Gallaher was shot at that time; it is a question of fact whether, after the shooting, the assailants returned to the victim's car and drove it around the city; it is a question of fact whether the assailants then parked the car and stripped it of its parts.

The trial court took a view that as a matter of fact all of these occurrences took place in unbroken sequence; the Virginia Supreme Court agreed with this factual determination. Only because there was before the Court uncontroverted [14] evidence that this was an ongoing robbery was the

Court able to rule that as a matter of law the robbery continued until Gallaher's subsequent death. Thus, if the Court's ruling be seen as a matter of fact, prompting its decision not to give the lesser included first-degree murder instruction, both *Sumner* and *Lonberger* prohibit reopening that factual determination in the context of a Federal habeas hearing. There is no challenge to that presumption of correctness based on one of the eight exceptions enumerated in § 2254(d) to mandate such a re-opening.

 If, on the other hand, the Court's refusal to give the lesser included offense of first-degree murder instruction be seen as a matter of law, petitioner still advances no reason for granting the writ sought. When a challenge to a jury instruction is presented to a federal habeas court, the single instruction must be viewed in the context of the overall charge in determining the constitutionality of its language. *Cupp v. Naughten*, 414 U.S. 141, 146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973); *Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977); *Gore v. Leeke*, 605 F.2d 741 (4th Cir.1979), *cert. denied*, 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 431 (1978). The Supreme Court has indicated that in federal criminal trials a defendant is entitled to a lesser included offense instruction if the evidence would permit a jury rationally to find him guilty of the lesser offense and to acquit him of the greater offense. *Kebble v. United States*, 412 U.S. 205, 208, 93 S.Ct. 1993, 1995, 36 L.Ed.2d 844 (1973); *United States v. Blankenship*, 548 F.2d 1118, 1120 (4th Cir.1976), *cert. denied*, 425 U.S. 978, 96 S.Ct. 2182, 48 L.Ed.2d 803 (1976). The Supreme Court has never explicitly addressed the question of whether a failure to give a lesser included offense instruction rises to the level of a constitutional violation:

> Indeed, while we have never explicitly held that the Due Process Clause of the Fifth Amendment guarantees the right

---

**14.** Defendant controverted his participation in the robbery and the murder, but that they occurred was not, indeed could not have been controverted.

of a defendant to have the jury instructed on a lesser included offense, it is nevertheless clear that a construction of the Major Crimes Act to preclude such an instruction would raise difficult constitutional questions. In view of our interpretation of the Act, those are questions that we need not face.

*Kebble* 412 U.S. at 213, 97 S.Ct. at 1998.

In fact, in *Easter v. Estelle,* 609 F.2d 756, 758 (5th Cir.1980), the Fifth Circuit, despite *Kebble,* stated:

It is not enough for ... [petitioner] to contend that he was deprived of due process because the trial judge failed to charge the jury on the law of criminally negligent homicide since it is a lesser included offense.... This Court has previously held that a State trial court judge's failure to instruct on a lesser included offense is not a federal constitutional matter. [citations omitted]. Therefore, we must. find that ... [petitioner] ... failed to state a federal claim upon which federal habeas corpus relief may be granted.

Assuming, however, that the Supreme Court's dictum in *Kebble* be taken for the law, *i.e.,* failure to give a lesser included offense instruction can rise to the level of a constitutional deprivation, that deprivation occurs only when evidence exists to support the giving of such instruction. *Kebble* 412 U.S. at 208, 97 S.Ct. at 1995.

In *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), the Supreme Court addressed a unique Alabama statute which prohibited a trial judge from giving the jury the option of convicting a defendant charged with capital murder of the lesser included offense of felony murder. The Supreme Court found that the statute violated both the Eighth Amendment, as made applicable to the States by the Fourteenth Amendment, and the Due Process Clause of the Fourteenth Amendment by substantially increasing the risk of error in the fact finding process.

▰ This case, however, does not lend support to petitioner's argument. The very reason that the Supreme Court reject-

ed the Alabama statute was that it did not allow the trial judge to give an instruction as to the possibility of finding the defendant guilty of a lesser included offense even if the evidence before the Court warranted such an instruction. The Court noted:

While we have never held a defendant is entitled to a lesser included offense instruction as a matter of due process, the nearly universal acceptance of the rule in both State and Federal courts establishes the value to the defendant of this procedural safeguard.

*Beck* at 637, 100 S.Ct. at 2389.

Virginia has no statute similar to that of Alabama; in this State instructions as to lesser included offenses are proper, but only when supported by the evidence. But as the Supreme Court taught in *Kebble* and in *Beck,* that instruction is appropriate only "if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater." *Kebble,* 412 U.S. at 208, 97 S.Ct. at 1995.

▰ At trial, defendant offered an alibi. The jury was thus presented with a choice between factual questions. The Commonwealth's evidence was solely to the effect that the robbery, if it occurred, was an ongoing one and that Gallaher was killed during the course of that robbery. Either the jury was to believe that petitioner Linwood Briley was present, participated in, and indeed committed the robbery-and-murder, or the jury could believe that he was nowhere near the site of the murder on the night in question. There was in short no rational way in which the jury could infer, given the evidence before it, that defendant Briley could have been guilty of the lesser included offense of first-degree murder. Therefore, an instruction to that effect was neither necessary nor appropriate.

### IX. *The Virginia Capital Murder Statute is Unconstitutionally Vague and Overbroad*

▰ Petitioner actually makes two arguments as to the vagueness and overbreadth of the Virginia capital murder stat-

ute: (1) that the statute fails to distinguish the crime of capital murder, carrying with it the possibility of the death penalty, from first degree murder, carrying with it the possibility of at most life imprisonment; (2) that the statute, by failing adequately to define the aggravating criteria permitting a jury to impose the death penalty, does not distinguish between capital murder appropriately punished by death and capital murder appropriately punished by life imprisonment. The Code of Virginia § 18.2–31(d) defines capital murder as the willful, deliberate, and premeditated killing of any person in the commission of robbery while armed with a deadly weapon. Such murders are punishable as a Class I felony defined by § 18.2–10(a) as felonies punishable by death or imprisonment for life.

Section 18.2–32 defines first degree murder as "murder, other than capital murder, by poison, lying in wait, imprisonment, starving, or by any willful, deliberate, and premeditated murder, or in the commission of, or attempt to commit ... robbery ...', except as provided in § 18.2–31." Such acts amount to murder in the first degree, punishable as a Class II felony. Section 18.2–10(b) sets out the punishment for Class II felonies at either imprisonment for life or for any term not less than twenty years.

The distinction between the two crimes is plain: To be found guilty of capital murder, a defendant must be proved, beyond a reasonable doubt, not only to have killed during the commission of a robbery, but to have killed willfully, deliberately, and with premeditation and while armed with a deadly weapon.

By contrast, first degree murder is specifically distinguished from such capital murder at the outset of the section. The phrase "other than capital murder" at the outset of § 18.2–32 makes the distinction explicit. It then goes on to define what activities constitute first degree murder. Among these are murders characterized by willfullness, deliberation, and premeditation. The very next word in the statutory language, however, is the disjunctive "*or*"

followed by murders committed while engaged in enumerated felonies including robbery. Thus, the defendant found guilty of first degree murder is the defendant who killed during the course of a robbery, but did not kill with willfullness, deliberation, and premeditation.

Put another way, the statute says: Defendant, if you commit a robbery while armed with a deadly weapon and in the course of that robbery you kill with deliberation, with premeditation, and with willfulness, you may be put to death. At the same time the statute says: Defendant, if while *not* engaged in the commission of enumerated felonies, including robbery, you kill with willfulness, deliberation, and premeditation, you may be imprisoned for life. The statute finally says: Defendant, if you are engaged in committing a robbery and during that robbery you kill, with or without a deadly weapon, without premeditation, without deliberation, but spontaneously, on the spur of the moment, you are guilty of first degree murder and may be sentenced to life imprisonment.

The statute limits capital murder; murder committed in the course of a robbery, standing alone, is not capital murder; nor is murder committed with deliberation and premeditation standing alone capital murder. Rather, capital murder is an appropriate finding only while both an ongoing robbery with a deadly weapon and a premeditated murder are present simultaneously, only where the defendant while engaged in the robbery with the use of a deadly weapon has killed willfully, with premeditation, and with deliberation, as in this case. *See Johnson v. Commonwealth*, 221 Va. 736, 273 S.E.2d 784, 787 (1981), *cert. denied*, 454 U.S. 920, 102 S.Ct. 422, 70 L.Ed.2d 231 (1981), ("[T]o convict of capital murder under subdivision (d) of Code § 18.1–31, the Commonwealth must establish all the elements necessary to convict of first degree murder, i.e., that the killing was willful, deliberate and premeditated and, in addition, all the elements necessary to convict of an armed robbery.") With regard then to petitioner's argument that

the Virginia capital murder statute is overbroad in failing to distinguish capital from felony murder, it is rejected as meritless.

 Petitioner also argues that the Virginia statute fails adequately to define the aggravating criteria which a jury must find in order to recommend the death penalty. Section 19.2–264.2 states:

> In assessing the penalty of any person convicted of an offense for which the death penalty may be imposed, a sentence of death shall not be imposed unless the Court or jury shall (1) after consideration of the past criminal record of convictions of the defendant, find that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing serious threat to society or that his conduct in committing the offense for which he stands charged was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim; and (2) recommend that the penalty of death be imposed.

In other words, a jury may find either that the defendant is potentially dangerous or that the crime was outrageously vile. On the basis of these findings, it may recommend the death penalty. The jury may find these aggravating criteria and still not recommend death; what the statute does do, however, is prohibit the jury from recommending death unless it finds the presence of one or the other or both of these aggravating criteria. In *Gregg v. Georgia*, 428 U.S. 153, 189, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976), *reh. denied*, 429 U.S. 875, 97 S.Ct. 197, 50 L.Ed.2d 158 (1976), the Supreme Court, reviewing its holding in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), *reh. denied*, 409 U.S. 902, 93 S.Ct. 89, 34 L.Ed.2d 163 (1972), stated:

> *Furman* mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.

Petitioner is arguing that the Virginia statute fails so to do, and that, therefore, the jury is left free to impose a penalty of death on the basis of whim, caprice, and emotional reaction. I am not persuaded by this argument.

In the first place, before the jury ever even confronts the possibility of sentencing the defendant to death, he must have been found guilty beyond a reasonable doubt of capital murder. This in and of itself, considerably narrows the category of persons who may be sentenced to death.

Looking specifically at the aggravating circumstances themselves, we find that *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), upheld potential dangerousness as a basis for the imposition of the death penalty. In *Jurek*, the Texas capital sentencing system limited capital homicides to intentional and knowing murders committed in five situations, including that of robbery. Once the jury found the defendant guilty of capital murder, it was required to answer three statutory questions, one of which was "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." The plurality opinion in *Jurek* rejected the argument that this question, requiring as it did consideration of the defendant's future dangerousness, was unconstitutionally vague because it required the jury to predict human behavior:

> It is, of course, not easy to predict future behavior. The fact that such a determination is difficult, however, does not mean that it cannot be made. Indeed, prediction of future criminal conduct is an essential element in many of the decisions rendered throughout our criminal justice system.... And any sentencing authority must predict a convicted person's probable future conduct when it engages in the process of determining what punishment to impose. For those sentenced to prison, these same predictions must be made by parole authorities.

The task that a Texas jury must perform in answering the statutory question in issue is thus basically no different from the task performed countless times each day throughout the American system of criminal justice. What is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine. Texas law clearly assures that all such evidence will be adduced. *Id.*, 274–76, 96 S.Ct. at 2957–58. [footnotes omitted]

*See also, California v. Ramos,* —— U.S. ——, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983) (approving "future dangerousness" instruction).

Petitioner also objects to the second criterion: that the murder for which he stands convicted was outrageously or wantonly vile, horrible or inhuman, depraved, or involved aggravated battery. In *Gregg v. Georgia,* 428 U.S. 153, 201, n. 51, 96 S.Ct. 2909, 2938 n. 51, 49 L.Ed.2d 859 (1976), *reh. denied,* 429 U.S. 875, 97 S.Ct. 197, 50 L.Ed.2d 158 (1976), the Supreme Court upheld the vileness criteria. Petitioner relies heavily on *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), *reh. denied,* 456 U.S. 1001, 102 S.Ct. 2286, 73 L.Ed.2d 1296 (1982), to cast doubt on the constitutionality of this instruction. While it is true that some language in *Godfrey* obscures the clarity which the Supreme Court perceived in identical language used in the jury charge in *Gregg,* *Godfrey* neither contradicts *Gregg* nor upholds petitioner's argument. The Supreme Court had commented in *Gregg* 428 U.S. at 201, 96 S.Ct. at 2938:

It is, of course, arguable that any murder involves depravity of mind or an aggravated battery but this language need not be construed in this way, and there is no reason to assume that the Supreme Court of Georgia will adopt such an open ended construction.

Subsequent to *Gregg,* the Supreme Court analyzed the circumstances in *Godfrey* to ascertain whether the Georgia Supreme Court had in fact adopted the open ended construction to which the Supreme Court

had adverted. In *Godfrey,* the defendant, having experienced marital problems with his wife and believing that his mother-in-law was responsible for his wife's decision not to reconcile, went to the trailer where his wife, his mother-in-law, and his daughter were located. He shot his wife in the head with a shotgun through a window in the trailer, killing her instantly. He then entered the trailer where, after striking and injuring his fleeing daughter with the barrel of the gun, shot his mother-in-law in the head, also killing her instantly. After the killings, the defendant called the police, acknowledged his responsibility for the crimes, characterized his acts as a hideous crime and indicated that he had been thinking about it for eight years and would do it again.

The jury found the defendant guilty of two counts of murder and one count of aggravated assault. At the bifurcated sentencing phase of the trial, the trial judge instructed the jury in the statutory language (as had the *Gregg* trial judge, *see Gregg v. Georgia, supra,* 428 U.S. at 216–18, 96 S.Ct. at 2945–46) (White, J., concurring). The jury imposed death sentences for both murder convictions, specifying that the aggravating circumstances as to each conviction was that the offense was "outrageously or wantonly vile, horrible and inhuman." The Supreme Court, in reviewing the Georgia Supreme Court's affirmation of the death sentence stated:

... [The] sentence of death [was] based upon no more than a finding that the offense was "outrageously or wantonly vile, horrible and inhuman." [citations omitted].... There is nothing in these few words, standing alone, that applies any inherent restraint on the arbitrary and capricious infliction of the death sentence. A person of ordinary sensibility could fairly characterize almost every murder as "outrageously or wantonly vile, horrible and inhuman." Such a view may in fact, have been one to which the members of the jury in this case subscribed. If so, their preconceptions were not dispelled by the trial judge's sentencing instructions. These gave the

jury no guidance concerning the meaning of any of § (b)(7)'s terms. In fact, the jury's interpretation of § (b)(7) can only be the subject of sheer speculation. *Id.* 446 U.S. at 428–29, 100 S.Ct. at 1764–65.

It is important to note that the Supreme Court did not find the Georgia statutory provision it had upheld despite a constitutional challenge in *Furman* and *Gregg* now to be constitutionally defective. What the Supreme Court did find to be unconstitutional was the vagueness of the sentencing judge's instructions to the jury as to how this criterion was to be applied. No such vagueness in jury instruction appears in the case at bar.

The jury instruction in question was delivered as follows:

> Members of the jury, (Reading) "You have convicted the defendant of an offense which may be punished by death. You must decide whether the defendant shall be sentenced to death or to life imprisonment. Before the penalty can be fixed at death, the Commonwealth must prove beyond a reasonable doubt at least one of the following two alternatives:—" Now, let me state to you: Of these two alternatives, part of you may believe one, part of you may believe another, but at least all twelve of you must believe one or the other.
>
> (Reading) "First, that, after consideration of his past criminal record, there is a probability that he would commit acts of violence that would constitute a continuing serious threat to society; or, two, that his conduct in committing the offense was outrageously or wantonly vile, horrible or inhuman, in that it involved torture, depravity of mind or aggravated battery to the victim *beyond the minimum necessary to accomplish the act of murder.*
>
> If you find from the evidence that the Commonwealth has proven beyond a reasonable doubt either of the two alternatives, then you may fix the punishment of the defendant at death or if you believe from all the evidence that the death penalty is not justified, then you shall fix

the punishment of the defendant at life imprisonment.

> If the Commonwealth has failed to prove either alternative beyond a reasonable doubt, then you shall fix the punishment of the defendant at life imprisonment." (Emphasis added.)

In *Stamper v. Baskerville*, 531 F.Supp. 1122, 1131 (E.D.Va.1982), remanded on other grounds, 724 F.2d 1106 (4th Cir.1984), this Court had occasion to address the identical jury instruction, and stated:

> [T]his instruction gave the jury adequate guidance in regard to the meaning of § 19.2–264.2's terms. It charges in unmistakable terms the jury's duty to eschew a finding that murder, *qua,* murder is outrageously vile and the like.

In *Stamper*, although petitioner had been convicted of three capital murders, the jury factored out one of these and found vileness:

> While finding petitioner's murder of Staples, accompanied by bludgeoning and cutting his throat, to be outrageously vile beyond that necessary to accomplish an act of murder, they specifically rejected this finding with respect to the Hicks and Cooley murders. The jury's careful distinction in its finding indicate that the charge was clear, correct, and, more importantly, understood.

*Id.*

Nothing in the instant proceeding persuades me that this jury, any more than the *Stamper* jury, was in doubt as to the meaning of these instructions. The exclusion of "vileness" as concomitant to murder per se was explicit in the instruction. It is worth noting in this context, that the jury unanimously found both of the aggravating circumstances present. Transcript at 859.

Petitioner argues that one cannot be absolutely certain that all jurors agreed on at least one aggravating circumstances unless it be manifest that they all agreed on both. Leaving aside the illogic of this argument, it has no legal support. In *Zant v. Stephens,* —— U.S. ——, —— – ——, 103 S.Ct. 2733, 2746–50, 77 L.Ed.2d 235, 254–259

(1983), the Supreme Court addressed a situation where three aggravating circumstances were presented to a jury as independent reasons for assessing a convicted defendant's penalty at death. While his appeal was pending, the Georgia Supreme Court found that one of these aggravating circumstances was unconstitutionally vague. The jury, however, had not relied on the constitutionally vague criterion, but in writing, had designated that it had found two other independent aggravating circumstances. The Supreme Court upheld the imposition of the death penalty.

Even as early as *Gregg*, a jury was presented three aggravating circumstances and chose two. *Gregg* 428 U.S. at 161, 96 S.Ct. at 2919. Thus, petitioner's argument that the Virginia statute is unconstitutional in not requiring a finding of both "future dangerousness" and "vileness" before imposition of the death penalty, is without merit. A jury in Virginia must find either future dangerousness *or* depravity before it may impose the death sentence, but it need not find both.

Finally, it should be noted that the Virginia statutory scheme also contains within it the provision whereby a jury may find both of these criteria and still elect not to impose the death penalty. It is required before such imposition for a jury to take into account all factors both in aggravation and in mitigation. Code of Virginia § 19.2–264.4. Furthermore, Virginia provides that any conviction for capital murder is, automatically to be reviewed by the Supreme Court of Virginia.

Therefore, it is concluded that habeas relief is barred on any claim of a defect in the statute.

X. *Is the Death Penalty Per Se Cruel and Unusual Punishment*

Petitioner raises yet again the argument that imposition of the death penalty in general and in petitioner's case in particular constitutes cruel and unusual punishment violative of the Eighth Amendment to the Constitution. Until *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), *reh. denied*, 409 U.S.

902, 93 S.Ct. 89, 34 L.Ed.2d 163 (1972), the Supreme Court had never squarely addressed the fundamental claim that the punishment of death is always, regardless of the heinousness of the offense or of the procedure followed in imposing sentence, cruel and unusual, and thus forbidden by the Eighth Amendment. *Furman*, however, left unresolved the question of whether capital punishment is *per se* unconstitutional.

In *Gregg v. Georgia*, 428 U.S. 153, 169, 96 S.Ct. 2909, 2923, 49 L.Ed.2d 859 (1976), *reh. denied*, 429 U.S. 875, 97 S.Ct. 197, 50 L.Ed.2d 158, the Supreme Court answered the question it had left open in *Furman:*

We now hold that the punishment of death does not invariably violate the constitution.

On the same day that the Supreme Court decided *Gregg*, in *Jurek v. Texas*, 428 U.S. 262, 268, 96 S.Ct. 2950, 2954, 49 L.Ed.2d 929 (1976), Justice Stevens, delivering the judgment of the Court, stated:

The petitioner argues that the imposition of the death penalty under any circumstances is cruel and unusual punishment in violation of the Eighth and Fourteenth Amendment. We reject this argument for the reasons stated today in *Gregg v. Georgia* [428 U.S.], at 167–68 [96 S.Ct. at 2922].

A failure to enforce the supreme penalty in an appropriate case may well inflict cruel and unusual punishment on the family and friends of the deceased victim. As to petitioner's argument that imposition of the death penalty in his particular case is violative of the Eighth Amendment, *see* Section III of this opinion.

XI. *Ineffective Assistance of Counsel*

Petitioner alleges that his trial counsel were ineffective and that he was therefore denied his right to counsel as guaranteed by the Sixth and Fourteenth Amendments. It is this charge that is most troublesome to the Court. Petitioner refers to thirty-three instances in which he contends his counsel were ineffective.

Effectiveness of counsel is judged by whether counsel acted within the range of competence expected of criminal lawyers. *Marzullo v. Maryland,* 561 F.2d 540, 542–43 (4th Cir.1977), *cert. denied,* 435 U.S. 1011, 98 S.Ct. 1885, 56 L.Ed.2d 394 (1978). To merit relief, the petitioner must show that counsels' error was the result of "neglect or ignorance rather than from informed, professional opinion." *Id.* at 548. *See Tolliver v. United States,* 563 F.2d 1117, 1121 (4th Cir.1977). Courts are properly reluctant to second-guess the tactics of trial lawyers. *Goodson v. United States,* 564 F.2d 1071, 1072 (4th Cir.1977). To warrant relief, an error must be prejudicial, *Id.* Once a prisoner demonstrates incompetence of counsel, the State has the burden to show the lack of harm or prejudice. *Kelly v. Warden, House of Corrections,* 701 F.2d 311, 313 (4th Cir.1983).

Respondent suggests that review of many of petitioner's allegations regarding the ineffectiveness of counsels' conduct of *voir dire* is precluded because petitioner did not present these claims to the Supreme Court of Virginia until he petitioned for a rehearing on his habeas claims. Respondent suggests that the Virginia Supreme Court would enforce its contemporaneous objection rule, Rule 5:21, in the context of the habeas hearing.

In *Murch v. Mottram,* 409 U.S. 41, 93 S.Ct. 71, 34 L.Ed.2d 194, *reh. denied,* 409 U.S. 1119, 93 S.Ct. 894, 34 L.Ed.2d 704 (1972), the United States Supreme Court ruled that a State prisoner may not deliberately "elect" not to comply with a State procedural statute regarding collateral proceedings and then assert in federal court that no rights were waived. 409 U.S. at 46, 93 S.Ct. at 73. The Supreme Court enforced a State procedural bar for habeas corpus hearings in federal habeas corpus proceedings. However, *Murch,* decided several years before *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594, applied the "deliberate bypass" standard of *Fay v. Noia,* 372 U.S. 391, 399, 83 S.Ct. 822, 827, 9 L.Ed.2d 837 (1963), which would hear a habeas claim despite a State procedural bar, unless the petitioner had deliberately bypassed State proceedings regarding that claim. Several courts have followed *Murch v. Mottram* in ruling that a habeas corpus claim can be heard in federal court even though it was not properly raised in the State habeas proceeding unless there is evidence of a deliberate bypass of the State proceeding. *See Harkins v. Wyrick,* 552 F.2d 1308, 1313, n. 7, (8th Cir.1977); *Bloodworth v. Hopper,* 539 F.2d 1382, 1384, n. 2 (5th Cir.1976).

In *Knott v. Mabry,* 671 F.2d 1208, 1210 (8th Cir.1982), *cert. denied,* 459 U.S. 851, 103 S.Ct. 115, 74 L.Ed.2d 101, *reh. denied,* 459 U.S. 1059, 103 S.Ct. 480, 74 L.Ed.2d 626 (1983), the Court held that where the petitioner was not assisted by counsel in filing his State petition for post-conviction relief the deliberate by-pass standard of *Fay,* rather than the cause and prejudice standard of *Wainwright,* would apply in procedurally barring review of his claims on the merits.

The implication of the *Knott* opinion is that the more recent *Wainwright* "cause and prejudice" standard for procedural bypass would apply in collateral proceedings in which counsel prepare the petition. I agree with that implication, particularly in view of the Supreme Court's recent strong emphasis on *Wainwright.* Whatever the validity of the *Knott* holding, petitioner in this case was counseled. The Court, applying *Wainwright,* would find that counsel's failure to assert objections to the conduct of *voir dire* until the petition for rehearing bars this Court's habeas review of those claims. As the law regarding the applicability of a procedural bar is unclear, however, the Court is of the opinion that petitioner's allegations also should be considered on the merits.

The *Murch* progeny would require this Court to inquire into counsel's apparent bypass of State habeas proceeding on the claims at issue. Further delay would be inevitable. While this Court does not by any means intend to act as a second in a duel between petitioner and his trial counsel, imputing and parrying procedural devi-

ousness, the Court is aware of the powerful incentive distinctive to capital cases to avoid decisions on the merits.

In a non-capital case, the thrust of the petitioner is to obtain a hearing in the supposedly more indulgent federal court as quickly as possible. So long as a hearing is delayed he is being punished under his sentence of confinement. In the death penalty case, the thrust of the petitioner is directly contrary. So long as a hearing is delayed he is not being punished under his sentence of death. Accordingly, the sensible and rational tactic of the capital petitioner is to use the court's rules and procedures to delay a hearing rather than to use the rules and procedures to advance a hearing. *Stamper v. Baskerville*, 531 F.Supp. 1122, 1133 (E.D.Va.1982), remanded, 724 F.2d 1106 (4th Cir.1984).

The Court concludes that the just, speedy, and effective disposition of these claims will be aided by reaching their merits rather than by barring them on procedural grounds.

■ The Court will note again that federal review of a petition for a writ of habeas corpus by a person in custody pursuant to the judgment of State court is limited by a presumption of correctness. 28 U.S.C. § 2254(d). "[The] interest in federalism recognized by Congress in enacting § 2254(d) requires deference by federal courts to factual determinations of all State courts." *Sumner v. Mata*, 449 U.S. 539, 547, 101 S.Ct. 764, 769, 66 L.Ed.2d 722 (1981). Therefore, this Court is bound by the factual determinations of the State habeas court in considering the acts supposedly amounting to ineffectiveness of counsel. The Court recognizes, however, that mixed questions of law and fact and conclusions based on facts, such as the habeas court's determination that counsel were not ineffective, are not entitled to the presumption of correctness. *Cuyler v. Sullivan*,

446 U.S. 335, 341, 100 S.Ct. 1708, 1714, 64 L.Ed.2d 333 (1980).

■ Petitioner argues that the factual findings of the State habeas court should not be presumed to be correct because the habeas hearing was an "openly partial one." Second Reply to Motion to Dismiss at 7. Petitioner apparently is attempting to fall within 28 U.S.C. § 2254(d)(6), one of the enumerated exceptions to the presumption of correctness, which states "that the applicant did not receive a full, fair, and adequate hearing in this State court proceeding." Having reviewed the record of the State habeas hearing, however, the Court is of the opinion that the petitioner did in fact receive a full, fair, and adequate hearing [15] and accordingly, those findings of the State habeas court which are purely factual in nature will be presumed to be correct.

■ Petitioner has raised a host of separate claims of ineffective assistance of counsel. After careful scrutiny of each (See Appendix II), I do not find that any one claim, nor indeed any possible combination of claims, amounts to the "neglect or ignorance" which, under *Marzullo*, must be shown to merit relief. *Id.* 449 U.S. at 548, 101 S.Ct. at 769.

## XII. *Totality of the Circumstances*

■ Petitioner's final claim reads as follows:

[His] conviction and sentence are unconstitutional in that, from the totality of the circumstances, including various errors and rulings of the trial court, highly prejudicial comments of the trial court, various forms of ineffective assistance of counsel and the other errors set forth above, the conviction and sentence are severely wanting in those assurances of reliability necessary before petitioner is executed.

Petitioner appears to argue that even if no one of the grounds adduced for federal

---

**15.** The State trial judge did show impatience. Had he not, he surely would have been a candidate for sainthood.

habeas relief is sufficient standing alone, taken together, the whole of petitioner's claim is greater than the sum of its parts. This argument is without a shred of legal validity. Moreover, it is indicative of the posture petitioner's counsel has taken during the whole of these proceedings. The Court recognizes that counsel for a petitioner in a capital case may desire to obfuscate, confuse, and delay the proceedings because as long as there is no decision from the Court, there is no punishment. The employment of such a tactic may be more frequent when no genuine issue supporting habeas relief can be found.

But there comes a time when the Court must, regardless of how laudable, or blameworthy, counsel for petitioner's motives may be, recognize that such delaying tactics are a disservice to justice. They are anarchistic. In *Evans v. Bennett*, 440 U.S. 1301, 1303, 99 S.Ct. 1481, 1482, 59 L.Ed.2d 756 (1979), Justice Rehnquist stated:

There must come a time, even when so irreversible a penalty as that of death has been imposed upon a particular defendant, that the legal issues in the case have been sufficiently litigated and relitigated so that the law must be allowed to run its course. If the holdings of our court in *Proffitt v. Florida*, 428 U.S. 242 [96 S.Ct. 2960, 49 L.Ed.2d 913] ... (1976); *Jurek v. Texas*, 428 U.S. 262 [96 S.Ct. 2950, 49 L.Ed.2d 929] ... (1976), and *Woodson v. North Carolina*, 428 U.S. 280 [96 S.Ct. 2978, 49 L.Ed.2d 944] ... (1976), are to be anything but dead letters, capital punishment when imposed pursuant to standards laid down in those cases is constitutional; and when the standards expounded in those cases and in subsequent decisions of this Court bearing on those procedures have been complied with, the State is entitled to carry out the death sentence. Indeed, just as the rule of law entitles a criminal defendant to be surrounded with all the protections which do surround him under our system prior to conviction, during trial and appellate review, the other side of that coin is that when the State has taken all the steps required by that rule

of law, its will, as represented by the legislature which authorized the imposition of the death sentence, and the State courts which imposed it and upheld it, should be carried out.

More recently, the Supreme Court has addressed the role of counsel in presenting issues on appeal. In *Jones v. Barnes*, —— U.S. ——, —— – ——, 103 S.Ct. 3308, 3312–3313, 77 L.Ed.2d 987 (1983), the Court commented:

Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues. Justice Jackson, after observing appellate advocates for many years, stated:

"One of the first tests of a discriminating advocate is to select the question, or questions, that he will present orally. Legal contentions, like the currency, depreciate through over-issue. The mind of an appellate judge is habitually receptive to the suggestion that a lower court committed an error. But receptiveness declines as the number of assigned errors increases. Multiplicity hints at lack of confidence in any one.... [E]xperience on the bench convinces me that multiplying assignments of error will dilute and weaken a good case and will not save a bad one." Jackson, "Advocacy Before the Supreme Court", 25 Temple L.Q. 115, 119 (1951).

Justice Jackson's observation echoes the advice of countless advocates before him and since.

## XIII. *Conclusion*

In a detailed and careful review of petitioner's trial, of his appeal to the Supreme Court of Virginia, of the State habeas corpus proceedings, of the *ore tenus* hearing before me, this Court is unable to find that petitioner has alleged even one claim of constitutional error which would entitle him to relief under 28 U.S.C. § 2254.

Petitioner has argued in his complaint and briefs a score or more points seeking

thereby to have his conviction overturned. Some of the points are claimed to be applicable to several different legal theories and several legal theories are claimed to be applicable to one or more points. Every facet of each point and theory is advanced with undifferentiated vigor. Petitioner's trial lawyers, the trial judge, the jury, the State habeas judge and the Virginia Supreme Court are in varying degrees excoriated for incompetence, bias, unfairness or ignorance. In brief, the claims asserted on petitioner's behalf are, or are almost, exhaustive. There is one significant, though not legally dispositive, argument, however, which petitioner has not proffered—he has not argued that he is innocent. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 259–66, 93 S.Ct. 2041, 2064–67, 36 L.Ed.2d 854 (1973) (Powell, J., concurring).

As an error of fundamental unfairness has not been discovered among the claims presented by petitioner, the petition for a writ of habeas corpus shall be DENIED.

An appropriate judgment shall issue.